Harold D. COOPER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. 02446.

United States District Court,
D. Nebraska.

June 2, 1970.

John Miller, and John J. Higgins, Jr.,
Omaha, Neb., for plaintiff.

Richard A. Dier, U. S. Atty., D.
Nebraska, for defendant.

MEMORANDUM

RICHARD E. ROBINSON, Chief
Judge.

This matter was tried to the Court
commencing on December 1st, 1969.
After receipt of the evidence the matter
has been thoroughly briefed by the respective parties. The Court is now prepared to render its decision, announcing
its findings of fact and conclusions of
law.

██ This case arises because of the alleged negligence, through its agents, of the Veterans Administration Hospital in Omaha, Nebraska [VA] in the treatment of the plaintiff during a brief visit in mid-1959 and a subsequent intermittent but still extended hospitalization over a 15 month period from mid-1964 until late 1965. Jurisdiction is established under the Federal Tort Claims Act, Section 1346[b] of Title 28 of the United States Code. Plaintiff, because of his working with a variety of dead animals, developed over a period of years, commencing in 1952, a disease known as brucellosis. It is the failure of the VA to diagnose this disease that is the basis of the case. While a medical facility, because of the conduct of its staff, is not negligent for an error in judgment, fault is established if the procedures utilized by the facility do not rise to the standard of care required of such a facility. It is the procedures utilized in failing to diagnose as well as the failure to diagnose itself that plaintiff here attacks. He generally claims, in addition to the failure to diagnose, the failure to culture for the brucella organism and to request the laboratory to perform more than one agglutination test; failure to have a consultation among the staff members of the VA hospital; and failure of the members of the various departments to communicate information each had concerning the plaintiff's sickness. It is the decision of this Court that any one of these above-mentioned failures, as well as the failure to diagnose, on the part of the VA constitute negligence for which some recovery should be allowed.

Plaintiff was employed in a packing plant from 1949 to 1952. During that period he worked in a part of the plant that processed waste animals of all types. Waste animals were those that could not be sold, usually those dying before slaughter. Plaintiff was thus exposed to dead diseased animals. This history was received by the VA when plaintiff was initially admitted to the VA in 1959. From 1954 until mid-1959 plaintiff was treated by physicians and in hospitals other than the VA. Even after the short visit in 1959, he was again treated by other hospitals and physicians. During this period, including the VA visit, plaintiff had some of the symptoms later leading to a positive diagnosis of brucellosis. No physicians up to his admission into the VA in 1964 had made a diagnosis of brucellosis. Plaintiff when he first incurred health problems in 1954 complained of chills, fever and fatigue. With limited antibiotics he secured temporary relief and was able to return to work. Over a period of years the chills, fever and fatigue kept returning and, as time progressed, these symptoms arose more frequently and eventually painful joints, and growths in the shoulder and chest also arose. Plaintiff, in 1964, because of rising medical costs, requested and received admittance to the VA. Prior to that date his shoulder had already been operated on. Upon his admission it was necessary to drain some fluid from this shoulder. Surgical procedures were also required on his chest and eventually upon his hip. These areas then ultimately also required drainage.

This intermittent but extended stay in the VA was from May of 1964 until October 12, 1965. On September 1st, 1965, plaintiff, at his own request, entered the Mayo Clinic where there was a positive diagnosis made of brucellosis. He then had six subsequent operations and hospitalizations other than at the VA to cure his numerous body failures all attributable to the brucellosis. As previously stated, a complete history including his contact with dead animals was taken when plaintiff was initially admitted to the VA medical department. At that time, the fever and fatigue subsided and he was released. When plaintiff was readmitted in May of 1964, this time to the surgical department, no request was made to the bacteriologist to specifically culture for the brucella organism and only one agglutination test was performed.

Regarding the failure to culture for the brucella organism and the failure to

have more than one agglutination test, Dr. Stoner, plaintiff's expert, testified that, as to the time when plaintiff was admitted in 1964, it was below the acceptable standard of practice not to run a series of blood or agglutination tests for brucellosis. This is further verified by medical textbook statements, confirming the need for more than one test. Those textbooks, in which doctors testifying are in agreement, also state the need for a culture to gain a positive diagnosis for brucellosis. The Court believes that the short stay in 1959 at the VA and the procedures utilized at that time as indicated by the evidence, are not sufficient to constitute negligence. However, it is inconceivable that a man can be under hospital observation over a period of a year, with chronic fever and fatigue and obvious disease spreading which the doctors admit was in the fungus, malignancy, tuberculosis, brucellosis field and still fail to run the accepted tests to gain a positive diagnosis of brucellosis. This is especially true in this part of the country. Brucellosis is not an uncommon disease in this area because of the cattle and swine industry present. It is no answer to say that the use of antibiotics obscured a possible diagnosis. The disease constantly and continually returned and finally there were present objective symptoms in the shoulder and hip. In short this plaintiff's life history, his chronic symptoms, and as of 1964, the need for surgery and drainage, should have required as the acceptable standard of medical practice a culture and series of blood tests specifically for brucellosis. See Hicks v. United States, 368 F.2d 626 [4th Cir. 1966].

Secondly, defendants' agents admit no formal or even informal consultation. They admit that if certain knowledge or opinions of some of the other doctors on the staff had been known to them they would have suspected brucellosis. Dr. Stoner's testimony confirms the rule that the failure to consult when a diagnosis is obscure falls below the acceptable standard of medical practice in this case. The commission responsible for hospital accreditation confirms that this procedure should be utilized. Because of the failure to consult or even informally communicate their respective informed opinions it is the holding of this Court that those failures constitute negligence. See Schwartz v. United States, 230 F.Supp. 536 [E.D.Pa.1964].

■ Finally, plaintiff claims that the failure of the defendant, through its agents, to diagnose brucellosis constitutes negligence. Essentially this is a more general claim of negligence and all of the preceding factors discussed, in addition to those now presented, are relied upon to show a faulty diagnosis. While plaintiff would desire the Court to say that the diagnosis of brucellosis should have been made in 1959, as previously stated, the evidence cannot support that claim. As defendant's brief stated, a physician is entitled to an error of judgment or an honest mistake. Brown v. United States, 419 F.2d 337 [8th Cir., December 5, 1969]; Cook v. Moats, 121 Neb. 769, 238 N.W. 529 [1931]. However, the failure to make the brucellosis diagnosis in 1964 is more than an error of judgment and does constitute negligence.

Besides the failures previously discussed, a letter from the Mayo Clinic staff, after Mr. Cooper had undergone their initial battery of tests in 1965, indicated that they would have affirmatively diagnosed brucellosis even without the standard tests being performed. The disease was so widespread that the diagnosis should have been apparent. While it is true that from mid-1964, the time the Court holds a diagnosis should have been made, until late 1965, when Mayo made its diagnosis, plaintiff's poor health condition grossly increased in comparison to the gradual change occurring over the previous ten years, the same essential symptoms were present in mid-1964, the difference being the degree of damage that had occurred. Additionally Dr. Stoner's testimony indicates that the standard of medical practice required a diagnosis, at the least, shortly after admission in 1964.

The VA should have, as Mayo did, perhaps quicker than is the minimum acceptable standard and with essentially the same symptoms, been able to diagnose brucellosis when a patient is almost constantly in pain, under defendant's constant care, with chronic symptoms, and with a history of contact with dead animals in a part of the country where persons are susceptible to the brucella organism. The combination of these factors completely obliterates any claim of a judgment error and shows conduct not rising to the acceptable standard of medical practice.

The matters of what damages resulted from or were proximately caused by the defendant's negligence and what benefits received by the plaintiff may be set-off against any reward received by the plaintiff still remain. There is no doubt that there already was considerable damage when plaintiff was admitted to the VA hospital in May of 1964. No doctor during the course of the trial has been able to say with reasonable medical certainty that if the disease had been discovered shortly after his admission to the VA in 1964, as it should have been, that plaintiff would have been able to return to his occupation. Nor has any witness been able to pinpoint the damage by way of additional medical, pain and suffering or loss of bodily functions that has occurred as a result of this defendant's negligence. The Court must therefore draw its own conclusions.

Brucellosis is a disease which can be carried in the human body for a long period of time and only rise to the surface periodically. In plaintiff's case it remained in this state until late 1963 of early 1964. At this time the more serious effect on the human body began to appear. During the 1964–1965 period the amount of occurring injury increased tremendously. Whereas before mid-1964 there were chills, fever and discomfort, as well as the shoulder and stomach problems previously discussed, in late 1965 a series of operations were required to combat attacks on joints and various parts of the chest, hips and stomach.

Plaintiff's spleen was eventually also removed along with a part of a bowel, hernias were prevalent, and arthritis had set in. It is also pertinent, as Dr. Stoner states, that anytime a man's weight is reduced from 150 pounds to 84 pounds, a great deal of strength is lost and is never fully recovered. All of the above are attributable to the brucellosis.

Once the disease is discovered the testimony of Dr. Stoner and the studies of other experts in the field, as testified to by Dr. Stoner, indicates that the arrest of this disease is uniformly favorable, that is to say that, with a strong build up of antibiotics over a period of a few months, the disease would be arrested and the damage already occurring would be limited.

It is apparent that if the brucellosis had been properly diagnosed and treated in mid-1964 plaintiff would not have had to undergo additional pain and suffering, nor the added expense of most of the additional surgical operations as well as additional medical and hospital care. As previously stated, once this disease reaches its height, if not checked, it will spread quickly and effect a wide variety of the body's organisms. That is what happened in this case. The disease had reached its height and had already started to spread when plaintiff was admitted to the VA in 1964. While physicians other than defendant's agents perhaps should have discovered the disease at an earlier date, the defendant had control over and was responsible for the plaintiff at a critical time when the disease was capable of and did the majority of the damage. For that reason it is the decision of the Court that defendant is liable for a very substantial part of the damage to plaintiff's body, past and future pain and suffering, and medical, hospital and surgical expense occurring after relase from the VA on or about September 1, 1965, and those to be incurred in the future.

Plaintiff also claims as part of his damages his loss in wages since defendant's negligence, as well as those future wages that will be lost as a result of de-

fendant's negligence. It is the ruling of the Court that defendant should be liable for the loss in wages plaintiff has and will incur because of his inability to perform his duties as a welder. In order to make this ruling it has been necessary for the Court to determine that if plaintiff's disease had been discovered in mid-1964 and then properly treated that he would have been able to return to gainful employment in the welding trade.

There is absolutely no doubt, based upon the testimony of the orthopedist, that plaintiff is now unable to perform any type of work requiring rigorous bodily exertion, including welding. There is also no doubt that there was some damage prior to plaintiff being admitted to the VA in 1964. A shoulder operation had already been performed, weakening plaintiff's shoulder to some degree prior to the VA admission, as well as evidence of an already developed mass in his chest. It is the opinion of the Court, however, that plaintiff could have returned to gainful employment if he had received proper treatment in mid-1964. As previously stated, the time spent under the control of the VA was the critical period when this disease was quickly spreading throughout the body. With the exception of the shoulder and chest mass, substantially all of the remaining deterioration occurred after the VA assumed responsibility for the patient. With regard to the shoulder, the orthopedist's testimony was that it is now weak. It is only reasonable that the shoulder was also subject to rapid deterioration and would not therefore be nearly as weak if there had been an early diagnosis followed by proper treatment. It may also be inferred that if the remainder of plaintiff's body, and especially a better hipjoint, which now in itself will prevent physical labor and which is almost all attributable to defendant's negligence, was in a generally good physical condition the relatively small damage to the shoulder would not have prevented gainful employment. Because of defendant's improper diagnosis during the critical period, the VA should be liable for lost wages from mid-1964 well into the future.

Also with regard to damages, a question has arisen as to whether or not the government is entitled to a set-off because of payments made to the plaintiff in the form of Social Security and Veteran's non-service connected disability benefits. Under Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 [1949] and under the Fourth Circuit's opinion after remand, United States v. Brooks, 176 F.2d 482 [4th Cir. 1949] there is no doubt that "the award should be diminished by the amount * * * received * * * from the government by way of * * * benefits" at page 484. See also 12 A.L.R.3rd 1245. The Court was there referring to servicemen's benefits. That court also recognized however that:

"the government may withdraw or decrease them at any time * * * and the trial court must deal with it as it deals with other uncertainties by using its best judgment after all the facts and circumstances of the case have been taken into consideration." at page 484.

As the Court interprets the statutes granting non-service connected disability benefits, specifically § 522 of Title 38, United States Code, there is a strong probability that benefits accruing to plaintiff after January 1st, 1971 will be substantially reduced, if not completely stopped, because of the large increase in plaintiff's net worth as a result of securing this judgment. Therefore while this Court will reduce the award in this case in the amount of the Veteran's Benefits already received, approximately Fourteen Thousand Dollars [$14,000.00], any benefits which could be received after January 1st, 1971 will in all probability be reduced substantially or terminated because of the substantial rise in net worth as a result of this judgment. Under the *Brooks* rule then future Veteran's benefits will not be given any consideration by the Court in determining the amount of the award be-

cause of the very strong probability that the benefits will and should be terminated.

 Concerning the Social Security benefits, it is the ruling of the Court that the award should not be diminished by the amount of this type of benefits received by the plaintiff. Under the Federal Tort Claims Act state law is the criterion for determining damages and also in determining the application of the collateral source rule. See Klein v. United States, 339 F.2d 512 [2d Cir. 1964]; Feeley v. United States, 337 F.2d 924 [3rd Cir. 1964]; Annot. 12 A.L.R. 3rd 1245. Nebraska applies the collateral source rule. Huenink v. Collins, 181 Neb. 195, 147 N.W.2d 508 [1966]. Under that rule as applied to Social Security Benefits which litigants have claimed diminish Federal Tort Claim awards, the case of United States v. Harue Hayashi, 282 F.2d 599 [9th Cir. 1960], is deemed applicable and controlling. That case essentially held that benefits such as Social Security benefits were not paid from unfunded general revenues, as tort claim awards are, but rather come from a special fund contributed to in part by the recipient and that therefore the payments under Social Security and those from which a tort award would be paid are from different or collateral sources. As they are from collateral sources one will not be allowed to diminish the other. Suffice it is to say, that is our situation here and the Court therefore adopts the *Hayashi* reasoning and holds that the defendant is not entitled to any set-off by reason of past or future Social Security benefits received or to be received. See also United States v. Price, 288 F.2d 448 [4th Cir. 1961]. Because of the application of the collateral source rule to Federal Tort Claims defendant's remaining arguments also must fall.

 The only matter now remaining is the amount of the award. Considering that plaintiff has incurred to date special damages of Fifteen Thousand Thee Hundred Sixty-eight Dollars and Ninety-four Cents [$15,368.94]; at the least, future medical expense for surgery of about Fifteen Thousand Dollars [$15,000.00]; loss of wages to date approximately Twenty-four Thousand Dollars [$24,000.00] and subtracting the offset of about Fourteen Thousand Dollars [$14,000.00], it is the judgment of the Court that plaintiff should be awarded the sum of One Hundred Thousand Dollars [$100,000.00] as the total amount for the damages previously mentioned as well as future lost wages and pain and suffering both past and future.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52[a] of the Federal Rules of Civil Procedure. Counsel for plaintiff to prepare an appropriate order.