Kenneth N. SWANSON, Plaintiff,

v.

The UNITED STATES of America, acting By and Through the VETERANS ADMINISTRATION, Defendant.

Civ. No. 82–1029.

United States District Court, D. Idaho.

Feb. 14, 1983.

Gary L. Montgomery of Marcus, Merrick & Montgomery, Boise, Idaho, for plaintiff.

Warren Derbidge, Asst. U.S. Atty., Boise, Idaho, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYAN, District Judge.

This non-jury action is a suit brought under the Federal Tort Claims Act, 28 U.S. C.A. § 1346(b). The plaintiff seeks to recover damages for injuries suffered by the plaintiff resulting from the government's failure to properly diagnose and treat a

brain tumor in a timely and proper manner. Trial commenced on January 24, 1983, and concluded on January 27, 1983. The parties introduced oral and documentary evidence. Prior to trial, counsel filed a stipulated joint pretrial statement and submitted to the court a proposed Pretrial Order, which was signed by the court on the first day of trial, stipulating liability. The parties agreed that the failure to perform a CAT scan by the Veterans Administration Hospital in the fall of 1976 fell beneath the medical standard of care. Counsel further filed with the court pretrial briefs, and at the close of the evidence the parties rested and the cause was submitted to the court. Counsel for both parties briefly made arguments to the court concerning certain inquiries of the court at the conclusion of the trial. The court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Federal Rules of Civil Procedure, on the issue of damages to be awarded to the plaintiff, Kenneth N. Swanson.

## FINDINGS OF FACT

1. The plaintiff, Kenneth N. Swanson, is presently 28 years of age and currently resides in Seattle, Washington.

2. That the plaintiff spent most of his minor years in Idaho Falls, Idaho. He enjoyed a close relationship with his father and stepmother and with his brothers. He enjoyed a normal childhood, which included a love of skiing and hunting and other outdoor activities. The plaintiff was described as being outgoing, popular with his peers, and enjoyed a good sense of humor.

3. The plaintiff's academic accomplishments in primary and secondary schools were average.

4. The plaintiff dropped out of his senior year in high school, obtained a G.E.D. from Ricks College, and in 1971 enlisted in the United States Army. He did well in the Army for the first couple of years and attained the grade rank of E–5 in a shorter than normal period of time. Thereafter, the plaintiff demonstrated problems which were noticed by others, and was admitted to an Army hospital in Frankfurt, Germany, where he was diagnosed as having acute schizophrenia. This ultimately led to his discharge (honorable) on July 23, 1974.

5. After plaintiff's discharge from the Army, he periodically sought medical assistance from the Veterans Administration and was unable to obtain relief from his continuing afflictions.

During the time he was seeking this help, principally at the V.A. hospital in Salt Lake City, he was diagnosed as having multiple sclerosis and schizophrenia. In 1976 he was referred to the Portland V.A. hospital, wherein his records showed a diagnosis of multiple sclerosis and schizophrenia. On or about September 21, 1976, at the Portland V.A. hospital, a Dr. Janice Stevens filed a report with the V.A. in Portland, Oregon, in which she stated that, "the possibility of a brain stem lesion, quite capable of causing all of [plaintiff's] signs, should be excluded." This was followed up in a written report by Dr. Douglas A. Robb, advising the Portland V.A. hospital to proceed with a workup and the diagnostic tool of a CAT scan was ordered. On October 1, 1976, the plaintiff was scheduled by written order of Dr. Robb for an E.M.I. (CAT scan) at Portland, Oregon, with instructions to, "look for signs of M.S. or brain tumor." This was never done and the plaintiff was discharged from the Portland V.A. hospital about one month later, on November 2, 1976.

6. The plaintiff continued to have problems and continued to deteriorate. He had weakness in his right arm and right leg, which had developed into chronic ataxia. He further developed loss of hearing in his right ear; slurring in his speech; vision problems, including blurring and double vision; and as time went on it became very difficult for him to swallow. Further, in 1978 he began to experience severe and excruciating headaches on a daily, 24-hour basis, which at times would totally immobilize him. Each of these symptoms got progressively worse through the years 1978, 1979 and into the spring of 1980.

7. In March of 1980 the plaintiff was flown to Boise, Idaho, and was seen by a Dr. Wilson, a neurologist, who, as a part of the examination, ordered a CAT scan. Dr. Wilson diagnosed the plaintiff as not having multiple sclerosis, but that he in fact had a massive brain tumor which had grown to such a size that it created a hydrocephalus or stopped the normal draining of brain fluids, thus causing an acute pressure problem which required the immediate placement of a shunt to drain off the brain fluids. In due course, this was followed by surgery for removal of an epidermoid tumor which was located in the posterior fascia. This epidermoid tumor, according to all experts testifying, apparently originated in the cerebella pontine angle. This epidermoid tumor was described by the doctors as very difficult to remove in that in its process of growing it creeps into all crevices, and in the area of the cerebella pontine angle, critical nerves are involved so that it was impossible for the surgeon to completely remove the tumor without causing further debilitating damage to the plaintiff.

8. The parties have agreed, and the defendant has admitted, that the failure of the Veterans Administration at Portland, Oregon, to perform the CAT scan in 1976 fell beneath the medical standard of care of the community and area. It was further admitted by the defendant that if the scan had been done by the Veterans Administration in 1976, such a scan would have disclosed a brain stem lesion or the tumor that was later found in 1980. The admission and the evidence is clear and convincing that there was a critical misdiagnosis by the Veterans Administration Hospital.

9. Following the surgery or removal of the epidermoid tumor, the plaintiff showed marked symptomatic improvement. He was relieved from his excruciating headaches from which he suffered continuously for approximately two years. His problem in swallowing disappeared, and his speech became greatly improved. His personality apparently became markedly improved to the delight of his family and close friends.

10. Postoperatively the plaintiff, for a time, was much more compatible with his family and friends. However, it now appears that the plaintiff's prior symptoms and personality problems and the prognosis thereof are again deteriorating. He later had an episode wherein he had an infection of the shunt, which was treated. The plaintiff will be required to continue with the shunt, which presently drains brain fluids into his abdomen, for the remainder of his lifetime.

11. Plaintiff's expert, Dr. Robert Burton, a specialist in neurology, has done a recent clinical examination of the plaintiff and is of the opinion (which opinion was not otherwise disputed) that the plaintiff continues to have the problems of a slurred speech, ataxia in his right arm and right leg and right hand, together with a weakness in his right arm and right leg; he suffers from double vision and ossolopsia (jiggly eyes), marked reduced hearing in his right ear, and is of the opinion, and the court so finds, that each and all of these disabilities are permanent.

12. Plaintiff's expert, Dr. Thomas Green, a clinical neuropsychologist who specializes in problems of behavior status of brain function, gave the plaintiff a large battery of psychological tests wherein he found from comparison to prior tests that had been given to the plaintiff and from his high school records, there had been a diminishing in plaintiff's I.Q. and a decline in his psychometric intelligence, and was of the opinion that the plaintiff could expect a further decline of psychometric intelligence greater than that caused by aging alone. He found there was a diminishing of memory ability and that, in his opinion, the plaintiff would not be able to reenter the work force.

13. Dr. Green further testified: the psychosis suffered by the plaintiff during the period of time from the onset of the tumor until the surgery in 1980, developed in the plaintiff a "life of its own which became inured and a part of the plaintiff's personality" and that the plaintiff continues to have chronic symptoms of being antisocial, diffi-

cult to deal with, a lower status, a strong animosity to his father and others, generally suspicious in nature, all of which is described as an organic personality syndrome.

14. Kenneth Swanson has undergone a painful and dangerous surgical operation upon his brain to remove the tumor, which tumor had grown to a point that it could not be fully extracted. He has undergone two eye surgical operations and will likely require further surgery on the eye. He faces the further likelihood of another life-threatening brain surgery.

15. Kenneth Swanson is no longer able to interact socially with others in a normal manner. He faces the likelihood or prospect that he will never be able to marry or enjoy the benefits of family life. He is no longer able to engage in recreational, sporting and other outdoor activities which he greatly enjoyed in the past, and as a result, his capacity for enjoying life has been greatly diminished.

16. Kenneth Swanson's ability to work is greatly impaired. He has lost wages and will incur additional lost wages in the future in that it would appear that he will never be able to join the work force, and thus his ability to engage in gainful employment has been greatly diminished, if not eliminated, and the court finds that plaintiff's earning capacity has therefore been permanently diminished or eliminated.

17. Dr. John W. Mitchell, who holds a doctor's degree in economics and is a professor at Boise State University, testified as an expert for the plaintiff as to an appraisal that he had made of the economic loss or loss of earnings suffered by Kenneth Swanson, both past and future, which included a 10 percent factor for loss of fringe benefits, which appraisal was admitted as Exhibit 10. Dr. Mitchell's appraisal and opinion is adopted as a finding of fact of this court, and which economic loss or loss of earnings amounts to the sum of $481,000.00.

18. Kenneth Swanson has been classified by the Veterans Administration as being 100 percent disabled, and under such classification is receiving and will continue to receive Veterans Administration benefits pursuant to 38 U.S.C. § 310. It was stipulated by the parties that these benefits would be a non-collateral source, and as such, the past and future benefits would be offset in the damage category of loss of earnings. It was agreed by the parties that the past benefits amounted to $70,046.89, and that future benefits on present dollars amounted to $129,953.11, or a total past and future benefits offset in the sum of $200,-000.00.

19. It was further stipulated by the parties that 38 U.S.C. § 521 would not apply or be applicable. This section contains language to the effect that if the veteran's estate is of sufficient size to generate income, that there is likely to be a reduction in pension benefits payable to the veteran because of an incremental increase in his estate which would be the result of a judgment such as the judgment in this case. The government thus agreed and stipulated that 38 U.S.C. § 521 only applies to benefits payable for non-service-connected disability, whereas the facts and circumstances in this case deal with disability payments to Kenneth Swanson based on his service-connected disability under 38 U.S.C. § 310.

20. The government further stipulated with plaintiff's counsel that during the future lifetime of Kenneth Swanson the government would continue to be obligated to pay for all medical, hospital, nursing, and health care costs that may be incurred in the future by Kenneth Swanson.

21. Kenneth Swanson has suffered, and will continue to suffer, great mental and physical pain and suffering as a direct and proximate result of the defendant's misdiagnosis.

22. Kenneth Swanson has suffered the destruction of his capacity to pursue a normal course of life by reason of his physical and mental disabilities hereinabove set forth as a direct and proximate result of the defendant's misdiagnosis.

23. To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are incorporated into these Findings of Fact.

## CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

2. The Federal Tort Claims Act holds the United States liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the government for personal injury "caused by the negligent or wrongful act or omission [of its employees] . . . while acting within the scope of [their] . . . employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). Exclusive jurisdiction to hear these actions is conferred upon the federal district courts. Although the omission or misdiagnosis was in the Portland Veterans Administration Hospital, the parties have stipulated in open court that the applicable law on damages in this case shall be that of the State of Idaho.

3. Under Idaho law, where it is determined that the defendant is liable for plaintiff's injuries, the plaintiff is entitled to recover for lost earnings and loss of future earning capacity in an amount that will reasonably compensate the plaintiff for any loss of past and future earning power occasioned by the injuries in question. In fixing this amount, the finder of fact may consider what the plaintiff's health, physical ability, and earning power were before the misdiagnosis and what they are now. The finder of fact is required to consider the nature and extent of the injuries whether or not they are reasonably certain to be permanent. All these matters are considered in order to determine, first, the effect, if any, the injury or injuries has had upon the past and future earning capacity, and second, the present value of any loss so suffered. *Patino v. Grigg and Anderson Farms,* 97 Idaho 251, 542 P.2d 1170 (1975); *Potter v. Mulberry,* 100 Idaho 429, 599 P.2d 1000 (1979); Restatement (Second) of Torts §§ 910, 912, 913A (1979).

4. Where it is determined that the defendant is liable for plaintiff's injuries, the plaintiff is entitled to recover the reasonable value of necessary expenses to the plaintiff for any medical, surgical, hospital, and other services and care and supplies, which the finder of fact determines to be reasonably certain to be required in the future in the treatment of the plaintiff, as the proximate result of the injury in question. As heretofore found in the Findings of Fact, the defendant has stipulated that the government shall be obligated to pay for all future medical, surgical, hospital, and other services and care and supplies that may be incurred in the future by Kenneth Swanson.

5. The finder of fact must reduce future damages for loss of future earning capacity or economic loss to the present cash value of such an amount, and award the present cash value of such future damages. Present cash value is a present sum of money which, together with what that money may reasonably be expected to earn in the future for the period the plaintiff is determined to suffer such loss, when invested at a reasonable rate of return, will produce the dollar equivalent of such future damages. Future increases in wages and inflation may be properly considered by a finder of fact in arriving at a reasonable amount to be awarded to plaintiff for future economic losses where there is testimony of economists introduced, because such testimony removes considerable speculation and conjecture from the deliberations of the finder of fact.

6. Under Idaho law the plaintiff is entitled to recover from a negligent defendant compensation for mental and physical pain and suffering. This does not require that any witness should have expressed an opinion as to the amount of damages that would compensate for such injuries. The law requires only that when making an award for pain and suffering, the finder of fact exercised calm and reasonable judgment. The amount of necessity rests in the sound discretion of the finder

of fact. *Bentzinger v. McMurtrey,* 100 Idaho 273, 596 P.2d 785 (1979). In personal injury actions there is no measuring stick by which to determine the amount of damages to be awarded for pain and suffering other than the intelligence of a fair and impartial trier of fact, governed by a sense of justice; each case must of necessity depend upon its own peculiar facts. There is no standard fixed by Idaho law for measuring the value of human health or happiness.

█ 7. Under Idaho law a plaintiff who has been permanently injured as a result of the negligence of defendant may recover such sum as will compensate him reasonably for such permanent injuries. *Conley v. Amalgamated Sugar Co.,* 74 Idaho 416, 263 P.2d 705 (1953); *McClain v. Lewiston Interstate Fair & Racing Assn.,* 17 Idaho 63, 104 P. 1015 (1909).

█ 8. The Veterans Administration benefits paid to the plaintiff under 38 U.S.C. § 310 are not a collateral source, because such benefits are paid to the injured plaintiff "from unfunded general revenue." The defendant is therefore entitled to an offset equal to the amount of Veterans Administration benefits already paid to the plaintiff and the present value of future Veterans Administration benefits to be paid to the plaintiff, which is to be deducted from the award for lost earnings and loss of future earning capacity. *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *United States v. Hayashi,* 282 F.2d 599 (9th Cir.1960).

█ 9. To date Kenneth Swanson has made no claim for increased disability rating because of claimed medical malpractice. 38 U.S.C. § 351 provides for an incremental increase in rating and benefits caused by malpractice. Counsel for the government in its brief agreed that should Kenneth Swanson apply for and receive additional compensation for the secondary service-connected injuries, this would not be an election of remedies on the veteran's part, and he can still draw additional disability compensation from the Veterans Administration while pursuing a medical malpractice action against the United States and under the Federal Tort Claims Act. Under Section 351 congress has provided that:

> Where an individual is, on or after December 1, 1962 awarded a judgment against the United States in a civil action brought pursuant to section 1346(b) of title 28, United States Code, or on or after December 1, 1962 enters into a settlement or compromise under section 2672 or 2677 of title 28, United States Code, by reason of a disability, aggravation, or death treated pursuant to this section as if it were service-connected, then no benefits shall be paid to such individual for any month beginning after the date such judgment, settlement, or compromise on account of such disability, aggravation, or death becomes final until the aggregate amount of benefits which would be paid but for this section equals the total amount included in such judgment, settlement, or compromise.

38 U.S.C. § 351 would be a collateral source; however, by its own mechanism, to avoid double recovery these benefits would abate to such individual until the aggregate amount of benefits which would be paid but for Section 351 equals the total amount included in such judgment.

Likewise, benefits paid for disability under any other collateral source, such as provisions under the Social Security Act providing for Social Security benefits, such benefits would be payments that are made from special funds supplied and would be a collateral source. Such benefits paid from such a fund would therefore be "collateral" to any FTCA recovery, and the government would be entitled to no offset or deduction for any such payments received in the future by the plaintiff. *United States v. Hayashi,* 282 F.2d 599 (9th Cir.1960); *Smith v. United States,* 587 F.2d 1013 (3d Cir.1978); *Cooper v. United States,* 313 F.Supp. 1207 (D.Neb.1970).

█ 10. The court concludes that the plaintiff, Kenneth Swanson, is entitled to recover damages against the defendant, the United States, as follows:

| | |
|---|---|
| Loss of past and future earning capacity | $481,000.00 |
| Less Veterans Administration benefits paid to date and to be paid | $200,000.00 |
| Subtotal | $281,000.00 |
| Past and future mental and physical pain and suffering and destruction of capacity to pursue a normal course of life by reason of the permanent injuries and deteriorating symptoms of the plaintiff | $700,000.00 |
| NET DAMAGES SUFFERED BY KENNETH SWANSON | $981,000.00 |

From the foregoing Findings of Fact and Conclusions of Law, the clerk is directed to enter judgment in favor of the plaintiff against the United States of America in the total sum of $981,000.00.