707 P.2d 388

**Paul BLACK, natural parent of Leona Black, Deceased, Plaintiff-Respondent,**

v.

**Brian Dale REYNOLDS, a single man, Defendant-Appellant.**

**No. 15299.**

Supreme Court of Idaho.

July 2, 1985.

Rehearing Denied Oct. 31, 1985.

Michael E. Ramsden, Boise, for defendant-appellant.

Fred R. Palmer, Sandpoint, for plaintiff-respondent.

Ronald J. Landeck, Moscow, for amicus curiae, Idaho Trial Lawyers Ass'n.

HUNTLEY, Justice.

Brian Reynolds appeals from a judgment in favor of Paul Black, the surviving father, in an action for the wrongful death of Black's minor child, Leona.

Leona, a sixteen-year-old, was killed while walking along the edge of State Highway 57 when she was struck by a Chevrolet van driven by Reynolds. The jury returned a verdict of $275,000 for Black. Reynolds appeals from the judgment and the order denying motion for a new trial. *We affirm.*

The evidence established that Leona Black and two companions were walking along the shoulder of the highway at approximately 11:45 a.m. on March 29, 1979, when the van driven by Reynolds hit Leona, causing her death.

Much of the testimony focused upon the relationship Paul Black, a member of the Cheyenne Tribe, had with Leona. Tribe members testified regarding the extended family and other aspects of the Cheyenne Indian culture. The testimony reflected that it is a social norm in the Cheyenne Indian culture for parents to leave a child

with persons outside the nuclear family and that this placement of the child outside the parent's home does not necessarily constitute abandonment or neglect. Reynolds contended throughout trial that Black had abandoned Leona prior to her death. Reynolds argued that as a consequence of the alleged abandonment Black should not be permitted to recover for Leona's wrongful death, and if recovery were to be allowed, the damages should be de minimis.

## I. *Interpretation of I.C. § 5-310*

■ The primary issue on appeal is whether the trial court erred in determining that under I.C. § 5-310, abandonment of a minor child by a parent prior to the child's death does not in itself preclude the parent from maintaining an action for the wrongful death of the child. The court concluded that I.C. § 5-310 permits a sole surviving parent who has abandoned his or her child to maintain an action.

At all relevant times, I.C. § 5-310 provided:

**5-310. Action for injury or death of unmarried child.**—The parents may maintain an action for the injury or death of an unmarried minor child, and for the injury or death of a minor child who was married at the time of his death and whose spouse died as a result of the same occurrence and who leaves no issue, and a guardian for the injury or death of his ward, when such injury or death is caused by the wrongful act or neglect of another, but if either the father or mother be dead or has abandoned his or her family, the other is entitled to sue alone. Such action may be maintained against the person causing the injury or death, or if such person be employed by another person, who is responsible for his conduct, also against such other person.[1]

In the present case, the trial court ruled that since Leona's mother was dead, Black was entitled to maintain the action even if he had abandoned his daughter prior to her death.

Reynolds submits that the statute stands for the proposition that a parent who has abandoned his or her child has no right to recover for the child's death, *whether or not* the other parent is alive. Clearly, under I.C. § 5-310 when *both parents* are alive and *one* has abandoned the child, the abandoning parent may not recover for the child's death. Reynolds argues that by abandoning a child, a parent forfeits his or her right to recover for the child's wrongful death. Reynolds urges the court to interpret the statute so as to discern that its primary purpose is the punishment of the abandoning parent. Relying on his proposed interpretation of the statute, Reynolds reasons that the death of the non-abandoning parent is irrelevant with regard to the "guilty" parent's right to recover. We reject Reynolds's suggested interpretation of I.C. § 5-310 and conclude that the statute merely confers a *preference* to the non-abandoning parent to bring a wrongful death cause of action where both parents are alive; it does not deprive a sole surviving abandoning parent of a cause of action. If, as Reynolds suggests, the legislature had intended to punish abandoning parents, the statute could have been written to preclude an abandoning parent's right to recover under any circumstances. This the legislature did not do. No wording in the statute indicates the legislature's intent in adopting the statute was to punish an abandoning parent. Rather the statute merely establishes a preference in the situation where one parent had abandoned a child and the other had not abandoned the child, so that the non-abandoning parent alone can maintain the action.

■ I.C. § 5-310 is silent as to whether a judicial proceeding resulting in the termination of parental rights is a condition precedent to the operation of the statute's language pertaining to abandonment. Clearly, where there has been a proceeding resulting in the termination of the parent-child relationship, an abandoning parent would have no right to recover for a child's wrongful death *regardless* of whether the

---

1. I.C. § 5-310 was amended in 1984.

other parent was alive or dead, his or her own parental status having been legally extinguished. In the instant case there was no judicial termination of Black's parent-child relationship with Leona. We conclude that in the absence of a proceeding terminating the parent-child relationship, a sole surviving parent's abandonment of a child will not in and of itself preclude maintenance of an action to recover for wrongful death.

Reynolds cites *Clark v. Jelinek,* 90 Idaho 592, 414 P.2d 892 (1966) for the proposition that an abandoning parent forfeits his or her right to custody of a child where the other parent has died and, by analogy, asserts that an abandoning parent forfeits the right to recover for a child's wrongful death where the other parent has died. However, the holding in *Clark* does not apply in the context of a wrongful death action.

■ The legislature's intent in enacting a statute may be implied from the language used or inferred on grounds of policy or reasonableness. *Summers v. Dooley,* 94 Idaho 87, 481 P.2d 318 (1971). If a sole surviving abandoning parent is not permitted to bring suit for the wrongful death of a child, the tortfeasor, barring the imposition of criminal penalties, will be able to completely evade legal sanctions because of the sad coincidence that his or her victim had been orphaned by one parent and "abandoned" by the other. Moreover, if there has been no proceeding terminating the parent-child relationship, we cannot conclude that the parent-child relationship has ceased to exist. The "abandonment" may be merely temporary and, had the child lived, a reconciliation might have taken place.

Hence, we conclude that the fact of abandonment if found by a jury may operate to mitigate the *amount* of damages recoverable; however, the abandonment itself does not preclude the *right* to recover.

In the case at bar, it is apparent that the jury did not accept Reynolds' theory of abandonment. Had the jury found complete and permanent abandonment, it is highly improbable that they would have returned a verdict of $275,000 for Black.

## II. *New Trial Motion—Excessive Damages*

■ Reynolds next assigns error to the trial court's denial of his motion for a new trial on the grounds that the jury awarded excessive damages.

I.R.C.P. 59(a)(5) provides:

**Rule 59(a). New Trial—Amendment of judgment—Grounds.—**A new trial may be granted to all or any of the parties and on all or part of the issues in an action for any of the following reasons:

. . . .

5. Excessive damages or inadequate damages, appearing to have been given under the influence of passion or prejudice.

As Justice Shepard, writing for a unanimous Court, declared in *Meissner v. Smith,* 94 Idaho 563, 565, 494 P.2d 567, 569 (1972), I.C. §§ 5–310 and 5–311 "clearly enunciate a legislative policy that the only limitation to be assigned to the amount of recovery is that amount 'under all the circumstances of the case [as] may be just.'"

Trial judges have traditionally been granted wide discretion in reviewing jury awards in the area of compensatory damages. *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 665 P.2d 661 (1983). In *McLean v. City of Spirit Lake,* 91 Idaho 779, 430 P.2d 670 (1967) this Court remarked that we are "firmly committed to countenance a wide discretion vested in the trial court to grant or refuse a new trial on the ground of an excessive verdict, and the exercise of such discretion will not be disturbed on appeal unless it manifestly appears to have been abused." (Citations omitted). 91 Idaho at 784, 430 P.2d at 675. We cannot conclude that the trial court abused its discretion in denying the motion for new trial in light of the evidence. The order denying Reynolds's motion stated, in part:

The evidence presented to the jury shows that the Black family are of Cheyenne-Arapahoe Indian descent. Leona was born unto Paul and Eunice Black on November 10, 1962.

The Black family, which also includes three other sons, stayed together until around 1970.

Witness Ed Star, Jr., described the family as very close and associated in fishing, playing games and swimming together. Star testified that Paul Black always managed to find work, was a good provider for the family and never abused any of the family members.

In 1968, Paul Black moved his family from Oklahoma to Lame Deer, Montana. Paul's wife, Eunice, wanted to be near her mother in Lame Deer.

There was no work to be found near Lame Deer and in 1970 Paul left his family in Lame Deer, Montana, and returned to Oklahoma to work as a "roughneck" in the oil fields.

Although Paul's wife refused to join him in Oklahoma, Leona did live with Paul from 1971 to 1977. (Eunice died in 1977 and Paul married Evelyn during this period.)

In 1977 Leona returned to Lame Deer, Montana in order to take care of her aging Grandmother, and thereafter little contact was had between Paul and Leona for the following reasons.

1.] Leona was accepted through the LDS Social Services Indian Placement Service for foster home care while attending school. The placement service ultimately placed Leona with a foster care family in Priest River, Idaho, while Leona attended Priest River High School in 1978 and 1979.

2.] Paul was sentenced to Federal Penitentiary for assaulting his brother and was incarcerated from March, 1978, to May, 1979. Paul testified that he had little contact with Leona from 1977 because;

A.] He knew that she was being adequately cared for through the LDS Foster Home Placement Service, and,

B.] He was ashamed to tell her he was in prison.

Paul testified that he never forgot Leona, prayed for her and his family every night and after her death, had her buried in an Indian cemetery in Oklahoma.

The jury was presented with abundant testimony from other witnesses describing the Indian culture and the family ties, such as:

1.] It is common practice among Indian families to have a child stay with and care for an older relative such as Leona staying with her Grandmother.

2.] Whoever the child visits or stays with has the responsibility for supporting the child.

3.] Love for family comes first and family ties are never severed even though the family is living apart.

4.] Indian parents feel close to their children although they seldom write or call.

The court concluded:

The verdict in this case must stand as rendered. In so deciding, the undersigned has had the opportunity to weigh the demeanor, credibility and testimony of witnesses in the persuasiveness of all the evidence and there is no doubt in the Court's mind that the jury reached its' [sic] decision on competent evidence of the value of the loss of a sixteen year old daughter, especially considering the unusual properties of the Indian culture. There was no reason for the Court to substitute it's [sic] judgment for the unanimous verdict of the jury.... Nothing in the evidence suggests bias, passion or prejudice on the part of the jury.

Having reviewed the record and having considered all relevant testimony, this Court cannot conclude, as a matter of law, that the trial court abused its discretion in denying the motion for a new trial on the ground the verdict was excessive.

### III. *New Trial Motion—Newly Discovered Evidence*

■ Reynolds next argues that the trial court erred in denying his motion for a new

trial on the ground of newly discovered evidence. Shortly after the trial concluded, Reynolds's trial counsel, Scott Reed, received a telephone call from one Judy Oscarson, who claimed to have been an eye-witness to the accident. Reynolds contends that had Oscarson been available as a witness, her testimony would have been material on the issue of comparative negligence. In an affidavit submitted to the trial court in support of the motion for a new trial, Oscarson stated in part, "I am positive that the Black girl was on the traveled portion of the highway and not on the shoulder. She was walking to my left of the fog line."

The trial court denied the motion, holding that given the weight of other testimony, Oscarson's testimony would probably have had no effect on the result of the trial, and that had counsel exercised due diligence, Oscarson could have been discovered prior to trial.

I.R.C.P. 59(a)(4) provides that a new trial may be granted when there is "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at trial."

Reynolds' counsel submitted an affidavit stating that during the trial, he asked Officer Hatch of the Priest River Police Department for permission to examine the police accident file, that he was granted permission to examine the file, and that his examination of the file revealed no statement taken by the police from Judy Oscarson, nor any reference to her as a witness.

As the trial court noted in its order denying the motion for a new trial, the statement set forth in Oscarson's affidavit contrasts sharply with the statements she had given to Officer Hatch of the Priest River Police Department. The statement made to Officer Hatch read:

I was turning into the parking lot of the High School and I met Brian Reynolds in his van. He was waiting for the traffic to clear so that he could turn on to the highway. I picked up my daughter at the school and left the parking lot, head-ing back towards town. I was the second car behind Brian. My speed at this time was 30 mph and I caught up with the cars in front of me. All of a sudden I noticed that the cars in front of me were stopping and I realized that there was some problem ahead of me.

We conclude that the trial court correctly determined that even if Oscarson's testimony had been available at trial, it is highly unlikely that the result would have been different. Since Reynolds had testified that prior to impact his vehicle had not crossed the white fog line, permitting the inference that Leona had been on the left side of the fog line, Oscarson's testimony would have been cumulative. Also, when Oscarson's statement as set forth in the affidavit is compared with her earlier statement to Officer Hatch, it appears to be relatively weak. Moreover, Police Chief Mitchell submitted two affidavits in which he stated that Oscarson's statement, wherein she identified herself as witness, was available as part of an accident file in his office since March 29, 1979. The record reflects, and Reynolds does not contest, that Reynolds's counsel did not request the accident report *prior* to the time of trial. Mitchell stated, "[t]o my personal knowledge the police file has at all times contained statements made on March 29, 1979, by Judy Oscarson and Robert J. Fitter...." Had Reynolds's counsel acted with due diligence, he would have, at a minimum, attempted to identify and interview eye-witnesses *prior* to trial. As an obvious step in this process, he would have requested the police accident file. The trial court did not err in concluding that Reynolds's counsel could have ascertained prior to trial that Oscarson was a witness.

#### IV. *New Trial Motion—Insufficiency of Evidence*

■ Reynolds next claims that the trial court erred in denying his motion for a new trial because the evidence was insufficient to sustain the verdict and the verdict was against the law. Specifically, Reynolds contends that the record established that

Leona was guilty of negligence per se by walking on the wrong side of the road.

I.R.C.P. 59(a)(6) provides:

**Rule 59(a). New trial—Amendment of judgment—Grounds.**—A new trial may be granted to all or any of the parties and on all or part of the issues in an action for any of the following reasons:

6. Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law.

I.R.C.P. 59(a)(7) provides in part:

7. Any motion based on subdivisions 6 or 7 must set forth the factual grounds therefor with particularity. On a motion for new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Reynolds failed to set forth with particularity the factual grounds in support of his motion. Without the benefit of such specificity, the trial court could not determine that the motion was based upon the grounds now argued for the first time on appeal. Because Reynolds failed to set forth factual grounds in support of his motion at the time it was presented to the trial court, we reject his claim of error without reaching its merits.

## V. *New Trial Motion—Jury Misconduct*

■ Reynolds also asserts that the trial court erred in denying his motion for a new trial on the ground of irregular jury proceedings and jury misconduct. In support of his motion for a new trial, Reynolds submitted an affidavit by juror Kevin M. Jones, which stated:

I served as a juror during a civil trial for damages by Paul Black against Brian Dale Reynolds. When the jury retired to consider the case, a number of the jurors said that they had read in the Sandpoint Daily Bee that the plaintiff was suing for $300,000. We used that figure as a

starting point in deciding how much we should award as a verdict.

Several of the jurors said that the defendant should be punished by a large verdict because he had been let off so lightly with only an inattentive driving charge instead of being charged with manslaughter.

I.R.C.P. 59(a)(2) provides:

**Rule 59(a). New trial—Amendment of judgment—Grounds.**—A new trial may be granted to all or any of the parties and on all or part of the issues in an action for any of the following reasons:

2. Misconduct of the jury; and when any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors.

Clearly, Jones's affidavit did not assert that the verdict was determined by chance, and therefore does not fall within the purview of I.R.C.P. 59(a)(2). Moreover, counter-affidavits submitted by two other jurors stated that the newspaper article alluded to in Jones's affidavit played no part in the jury's process in reaching its ultimate verdict. Hence, even were we to conclude that the trial court should have considered the jurors' affidavits in deciding the issue, we would not reverse the ruling as no prejudice resulted therefrom.

Reynolds also challenges the trial court's instructions. We have reviewed the instructions and have considered the arguments advanced in support of the contention that the instructions were improper. We deem these arguments to be without merit.

The judgment is hereby affirmed. Costs to respondent. No attorney's fee awarded on appeal.

DONALDSON, C.J., and SHEPARD and BISTLINE, JJ., concur.

BAKES, Justice, concurring in part and dissenting in part:

I concur in all of the majority opinion except that portion dealing with the trial court's ruling on the motion for new trial for excessive damages. Regarding that issue, the majority concludes, "Having reviewed the record and having considered all relevant testimony, this Court cannot conclude, as a matter of law, that the trial court abused its discretion in denying the motion for new trial on the ground that the verdict was excessive." That conclusion ignores the standard enunciated in our most recent cases.

It is now well established that, in considering a motion for new trial based on allegations that an excessive verdict has been rendered, a trial judge is to act as a "thirteenth juror." *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 904, 665 P.2d 661, 668 (1983); *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979); *Blaine v. Byers*, 91 Idaho 665, 670, 429 P.2d 397, 402 (1967). In *Dinneen v. Finch, supra,* we specifically defined the trial judge's duties:

"Where a motion for new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive 'as a matter of law.' *Blaine v. Byers, supra.* Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial." *Dinneen v. Finch*, 100 Idaho at 625–26, 603 P.2d at 580–81. (Citations omitted.)

Thus, based on *Dinneen,* the trial judge's duty, when considering a motion for a new trial based on allegations that an excessive verdict has been rendered, is to independently weigh the evidence and then compare the jury's award with what he would have given had there been no jury. The "substantial evidence" standard of review has no application.

Here, the trial judge stated,

"The verdict in this case must stand as rendered. In so deciding, the undersigned has had the opportunity to weigh the demeanor, credibility and testimony of witnesses and the persuasiveness of all the evidence and *there is no doubt in the court's mind that the jury reached its decision on competent evidence* of the value of the loss of a 16 year old daughter especially considering the unusual properties of the Indian culture. There is no reason for the court to substitute its judgment for the unanimous verdict of the jury." (Emphasis added.)

In so ruling, the trial judge failed to apply the *Dinneen* standard, because he made no independent determination of "what he would have given had there been no jury." Consequently, he had nothing "to compare the jury's award to." *Dinneen v. Finch, supra* at 625, 603 P.2d at 580. Instead, he used the disapproved "substantial evidence" standard. However, *Dinneen* clearly indicates that the substantial evidence standard is not to be applied.

I would reverse the trial court's ruling on the motion for new trial and remand this case to the trial court to reconsider the motion for new trial for excessive damages. In so doing, the trial court should follow the directives of *Dinneen* and independently weigh the evidence of damages, as a "thirteenth juror," and "then compare the jury's award *to what he would have given had there been no jury.* If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to

such in the record. The appearance of such is sufficient." *Dinneen v. Finch*, 100 Idaho 620, 625–26, 603 P.2d 575, 580–81 (1979) (emphasis supplied).

BISTLINE, Justice, concurring and specially concurring.

## I.

Because this appeal has presented the first opportunity to revisit *Dinneen v. Finch*, and hence is of more than ordinary importance, I write only to agree with the remarks of Justice Bakes in his separate opinion where he writes that in considering a motion for new trial, or alternatively for a remittitur or additur, as the case may be, the trial court first weighs the evidence on damages and then compares the jury's award to what he would have given in a court trial. "If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand." Bakes, J., 109 Idaho at 284, 707 P.2d at 395. This is exactly the main holding of *Dineen*, 100 Idaho at 625, headnote 5, 603 P.2d at 580, a 4–1 decision with Justice Bakes voting with the majority. Today's opinion for the Court better might have more clearly pointed out that defendant's motion for a new trial in the district court was premised on both Rule 59(a)(5) as well as Rule 59(a)(6).

The defendant's brief in arguing the applicability of Rule 59(a)(5) and *Dineen* falls far short of the accuracy attained in Justice Bakes' remarks. Defendant's contention urged upon us is only that "The trial court must overturn the jury award if there is a great disparity between that award and the amount of damages which, in the court's view, the evidence would have supported." Appellant's Brief, p. 36. At page 39, defendant urges that "the record shows that the amount of damages awarded in this case was unjust and exces-

sive *as a matter of law.*" (Emphasis added.) That is not at all the rule in *Dineen.* Rather, the defendant's obligation was to convince this Court that the trial court erred in not finding a disparity so great as between what it would have awarded in a court trial as compared to the jury award, to suggest that the jury bolted the traces of reality *and awarded excessive damages out of passion or prejudice.* As stated in *Dineen,* and recognized at page 36 of appellant's brief, it is the Supreme Court which can interfere with damages when the excess or inadequacy appears as a matter of law. 100 Idaho at 626, 603 P.2d at 581. Apparently, defendant failed to grasp all that was written under headnote 5 on pp. 625–26, 603 P.2d at 580–81.

## II.

The defendant conceded that the trial court did engage in the weighing process, and then adds that "the court gave absolutely no weight to any of the objective factors which demonstrated the absence of any relationship between respondent and his daughter." Appellant's Brief, p. 36. Those factors are found painstakingly repeated in the opinion for the Court. Defendant simply argues that the trial court didn't weigh the evidentiary factors as defendant would have it done, and preferred that the jury likewise would have done.

Where the defendant himself concedes that the trial court did enter into the *Dineen* opinion weighing and comparing process, in addressing a Rule 59(a)(5) motion, not readily understood is the basis on which Justice Bakes writes that he would reverse the trial judge for not following the directives of *Dineen.* The trial judge, who wrote, as Justice Bakes quotes him, that in upholding the verdict, i.e., denying the motion, he "has had the opportunity to weigh the demeanor, credibility and testimony of witnesses and the persuasiveness of all the evidence ..." [1] will be much surprised to

---

1. A worthwhile exercise is to compare this choice of language with language from *Dineen:*
   A trial court in a jury trial hears exactly the same evidence as the jury hears, and makes

his own inward assessments of credibility and weight. So, when after a trial the jury returns a verdict which is thereafter assailed, either as excessive or as inadequate, the trial court's

learn that one member of the Court sees implicit in that statement the admission that the opportunity was eschewed! Contrariwise, most will see the statement as tantamount to saying that the evidence was weighed just as it would have been in a trial to the court, and no so great disparity was found to exist as to suggest the influence of jury passion or prejudice.[2] As I read Justice Bakes, the complaint he makes is based wholly upon his semantical view that for the trial court to write that it had the opportunity to weigh the evidence is not to say that he did weigh the evidence. The trial bench and bar may find that bit of sophistry hard to swallow, especially those who recognize the trial judge as one of Idaho's most able jurists, if not the most able.

judgment is then called into play, requiring of him a *weighing* of the evidence. ...

. . . .

"[T]he trial judge was in a position to see and hear the witnesses speak. He could observe their demeanor on the witness stand, and consequently was in a better position *to judge their credibility and to weigh their testimony* than is this court ...." (Emphasis added)

*Rosenberg v. Toetly,* 93 Idaho 135, 138–139, 456 P.2d 779, 782–783 (1969).

*Dineen, supra,* 100 Idaho at 624–25, 603 P.2d at 579–80 (emphasis original).

2. In *Bentziger v. McMurtrey,* 100 Idaho 273, 596 P.2d 785 (1979), although the plaintiff's motion for new trial, or alternatively for additur, was based on rule 59(a)(5) as well as upon 59(a)(6), the opinion for the Court avoided discussion or dealing with the proper rule to be applied. *See* separate opinion of Bakes, J., 100 Idaho at 274, 596 P.2d at 186. For that reason it has little, if any, application to this case. I mention it only in aid of clarification.