733 P.2d 1234

**Lorenzo SANCHEZ, Plaintiff/Appellant, and Cross-Respondent,**

v.

**Frank GALEY, Jr., d/b/a Bennett Creek Farms, and Rusty Anderson, Defendants/Respondents and Cross-Appellants.**

No. 15918.

Supreme Court of Idaho.

Oct. 17, 1986.

On Denial of Rehearing March 4, 1987.

John Hepworth (argued) and John T. Lezamiz (argued), Twin Falls, and Jerry Goicoechea, Boise, for plaintiff/appellant and cross-respondent.

David E. Comstock, Robert M. Tyler, Jr., Donald A. Kofoed (argued), and Jeffery J. Ventrella (argued), Boise, for defendants/respondents and cross-appellants.

HUNTLEY, Justice.

This appeal arises from an action for damages filed by Lorenzo Sanchez as a result of an injury sustained while employed by Bennett Creek Farms. Sanchez had worked at Bennett Creek, owned by Frank Galey, Jr., for approximately one week before he suffered the severing of his right (dominant) hand while unclogging a potato harvester driven by Rusty Anderson, an employee of Bennett Creek.

The jury found defendants' negligence to be the sole proximate cause of Sanchez's injuries and awarded Sanchez $1,350,000 in damages. The district court denied defendants' motion for a new trial based on their contentions of unfair prejudice due to allegedly improper jury instructions, improper admission of certain testimony regarding Sanchez's economic damages, and improper denial of admission of statements made by Anderson prior to trial. However, pursuant to its interpretation of *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979), the trial court ordered that Sanchez elect to either submit to a remittitur of judgment to $950,000 or to a new trial on the ground that the verdict was excessive pursuant to *Dinneen, supra* and I.R.C.P. 59(a)(5).

On November 6, 1982, Sanchez was working at Bennett Creek as a "clod picker." One of his duties required that he occasionally unclog the potato harvester on which he worked.

The person in charge of the farm at that time was Dick Nelson; second in command was Gary Smith. Rusty Anderson, the operator of the potato harvester had not previously operated a potato harvester. Smith gave Anderson training over a two-week period on the operation of the harvester and the attached tractor. In particular, Smith showed Anderson the chain and sprockets involved in the accident, and instructed him to disengage the power take-off (the shaft that transfers power from the tractor to the harvester, referred to as the PTO) whenever anyone was unclogging

the harvester, instructed him to remain in the tractor cab while workers unclogged the machine, and directed him to make certain everyone was clear of the machine before reengaging the PTO. This procedure was made clear by safety warning signs on the harvester.

Sanchez was unfamiliar with the equipment, neither spoke nor understood English, and so could not read or understand the English safety warnings. Anderson, who spoke no Spanish, demonstrated to Sanchez how to unclog the harvester and perform his other assignments. Anderson admitted that he fully appreciated that Sanchez and the other workers depended on him for their safety.

Four individuals witnessed the accident: Jose Louis Esquivel (a co-worker of Sanchez), Bernardo Corral (driving the truck beside the harvester), Anderson and Sanchez. In addition, Smith was close by and had observed Anderson's activities prior to the accident.

Esquivel and Sanchez testified that they had been unclogging the harvester in the manner demonstrated by Anderson for five or six days. They testified that immediately prior to the accident, the machine had clogged, Anderson had stopped and disengaged the harvester, and Anderson had directed them to descend from the top of the machine to unclog the harvester. This they proceeded to do when, after a few minutes and without warning, the machine started, severing Sanchez's hand and fingers. Corral also testified that when the harvester clogged, Anderson stopped and disengaged the harvester and then signaled him to stop the truck and signaled the workers to go underneath the machine to unclog it. Corral got out of his truck and was standing alongside the truck when the accident occurred. According to Corral's testimony, after several minutes, rather than signal Corral to position the truck before restarting, Anderson engaged the harvester without warning.

Smith testified that he had carefully observed Anderson operating the machine for two-and-one-half weeks, and had observed Anderson throughout the day of the accident, and that Anderson had always turned off the PTO as he had been instructed except on the sole occasion of the accident.

In contrast, Anderson testified that over the previous one-and-one-half to two weeks he had adopted a different, faster method for unclogging the machine. His method involved stopping the tractor with the PTO engaged, and then himself getting out of the cab and pushing with his feet to cause the digger chain to begin turning again. During this procedure, Anderson testified, he did not request the workers to come down off the harvester and that the workers had not gotten under the harvester prior to the accident. Anderson testified that he was following this procedure with the PTO engaged when the accident occurred. All of this testimony was contrary to Anderson's deposition taken three months after the accident, in which Anderson stated that he had shut off the PTO while the harvester was being unclogged, and then had reengaged it. Counsel for Sanchez used this deposition to impeach Anderson's trial testimony.

Dr. John Kloss, who had attempted the surgical replantation of the right hand and three fingers, testified regarding the extensive medical complications which occurred and the numerous medical procedures performed before trial and required in the future. Sanchez's hand remains completely nonfunctional, and perceives only slight sensation. Dr. Kloss testified as to the difficulty of right-handed persons such as Sanchez who have lost the use of that dominant hand. He testified that Sanchez had no occupational function in the hand, and recommended against Sanchez returning to manual labor.

Dr. Hurst, a psychologist, testified on psychological difficulties Sanchez was experiencing as a result of the injury.

Dr. Barry Ben-Zion, a forensic economist, testified on Sanchez's lost past and future wages. His testimony was based on an interview with Sanchez and statistics compiled by the Bureau of Labor in California and the State of Idaho. Adjusting for vari-

ous economic factors, Dr. Ben-Zion calculated the present value of Sanchez's lost future earning capacity to be approximately $700,070. He cited to two U.S. government studies (prepared by the Veterans' Administration) which demonstrated that an injured worker who has lost the use of the dominant hand could expect, on average, a reduction of pre-morbidity earnings of 70%. Dr. Ben-Zion testified that since Sanchez had only the equivalent of a sixth grade education, he would probably suffer a reduction in earning capacity of greater than 70%, due to forced reliance on his physical prowess and the use of his hands. Dr. Ben-Zion also testified that the value of lost household services which Sanchez had difficulty performing was $3,000 per year. Sanchez himself also testified to the difficulties he did, indeed, have in performing various household services.

The defense sought testimony from Nelson as to a conversation he had with Anderson on the day after the accident. When Sanchez's counsel made a hearsay objection, the defense counsel argued the statement was admissible as a prior consistent statement offered to rebut a charge of recent fabrication. The court sustained the objection.

During cross-examination, defendants' expert, Dr. Blotter, testified that during his first visit he had noticed that one of the persons present had stated that "the tractor operator admits negligence in not shutting off the PTO." One of the persons present during the visit was insurance claims adjuster Sandee Hagen. The court instructed the jury that the persons present were agents of defendant Galey. Defendants' counsel unsuccessfully objected that, if indeed it was Hagen who made such a statement, she was not an agent whose statements were binding on defendant Galey.

Following the court's order of a new trial unless Sanchez accepted a $400,000 remittitur to $950,000, Sanchez filed a motion for reconsideration supported by an affidavit taken from jury foreperson, Suzette Payne. The district court denied the motion.

Sanchez appealed the remittitur as an interlocutory order to this Court, and also petitioned for writ of prohibition. The former was accepted, the latter denied, and further proceedings below were stayed pending this appeal. The defendants cross-appealed.

There are eleven issues on appeal. (1) Whether the district court was correct in its interpretation of *Dinneen, supra,* requiring the court to substitute its opinion on damages for that of the jury; (2) whether it was error to instruct the jury that violations of certain OSHA regulations constituted negligence *per se;* (3) whether there was error in stating as a matter of law, that an insurance claims adjuster was an agent of the insured for purposes of binding defendants with an admission of negligence possibly communicated by the adjuster to the defendants' expert; (4) whether it was error to deny the admission of testimony offered by defendants concerning an allegedly consistent statement of defendant Rusty Anderson, made prior to trial, and offered for the purpose of rebutting a charge of recent fabrication; (5) whether it was error to permit plaintiff's economist to testify concerning lost earnings, present and future, over the defendants' objection that the evidence lacked foundation; (6) whether it was error to permit plaintiff's economist to use Veterans' Administration and Social Security Administration disability studies as a basis for his calculations despite defendants' objection that the testimony lacked foundation; (7) whether it was an abuse of discretion to deny defendants' motion for new trial on grounds of surprise, after plaintiff's economist had based his trial opinion partially upon disability studies which he had failed to disclose in his deposition taken one week before trial; (8) whether it was error to grant plaintiff's motion *in limine* precluding any mention of plaintiff's alienage status; (9) whether it was error to admit evidence on the value of plaintiff's lost household services despite defendants' objection that it lacked foundation; (10) whether Sanchez is entitled to post-judgment interest

from the date of the district court's judgment until payment is made (regardless of whether $1,350,000 or $950,000 is the applicable damage judgment); (11) whether attorney's fees should be awarded on appeal.

## I. MOTIONS UNDER I.R.C.P. 59(A)(5)

This appeal raises not only a question of the application of *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979) to this case, but also requires further articulation of the respective functions of judge and jury in the context of a motion for new trial, pursuant to I.R.C.P. 59(a)(5) and (6).[1]

We have recently dealt with this issue in detail in *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986). In *Quick*, we restated the following long-standing rule regarding a judge's authority to reduce a verdict or grant a new trial upon a motion for new trial:

"On a motion for a new trial the court weighs the evidence and the credibility of the witnesses...." (*Quick*, 111 Idaho at 766, 727 P.2d at 1194.)

Such statement was a succinct compilation of the rule in *Dinneen*, wherein we further explained:

Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient.

*Dinneen*, 100 Idaho at 625, 603 P.2d at 580–581. (*See also, Mendenhall v.*

*MacGregor Triangle Company*, 83 Idaho 145, 150, 358 P.2d 860 (1961).

Upon a motion for new trial pursuant to I.R.C.P. 59(a)(6), the court's weighing process is not merely a right that the court may exercise, but its responsibility—an additional safeguard to reaching a just result. "[T]he trial court has the responsibility to weigh the evidence and make the determination whether the evidence supports the verdict." *Dinneen*, 100 Idaho at 623, 603 P.2d at 575, quoting *Mendenhall, supra* at 150, 358 P.2d at 860. So too, the court has the responsibility on a motion pursuant to I.R.C.P. 59(a)(5) to weigh and decide whether passion or prejudice appear from the verdict. Such statements make it abundantly clear that the trial court has the discretion and prerogative to redress, by way of ordering a new trial and/or remittitur, what it perceives as a miscarriage of justice. (*See, Quick*, 111 Idaho at 767, 727 P.2d at 1195; *Blaine v. Byers*, 91 Idaho 665, 671, 429 P.2d 397, 403 (1967). Because of the breadth of the trial court's prerogative in this area, it had been difficult to define exactly when a trial court has exceeded the bounds of the discretion vested it.

Fortunately, our recent decision in *Quick, supra* provides a detailed analysis of this problem, and clarifies the standard by which trial court judges may gauge their own determinations as against those of the jury while attempting to ascertain whether the influence of passion or prejudice has intruded upon the jury's deliberative processes.

Perhaps the most confusing aspect of *Dinneen* is its intimation that, after the trial court has weighed the evidence and reached its determination, its determination is then of equal parity with that of the jury. *Quick* makes it abundantly clear that such is not the case. While the trial court is in a unique position to assess flaws

---

1. I.R.C.P. 59(a)(5) and (6) read:
 Rule 59(a). New trial—Amendments of judgment—the parties and on all or part of the issues in an action for any of the following reasons:
 . . . .

 (5) Excessive damages or inadequate damages, appearing to have been given under the influence of passion or prejudice.
 (6) Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law.

or weaknesses in a jury's verdict, "having heard *and determined many hundreds of damage claims*" (*Dinneen*, 100 Idaho at 624, 603 P.2d at 579.), the trial court may not merely substitute its opinion for that of the jury.

> [R]espect for the collective wisdom of the jury and the function entrusted to it under our constitution suggests the trial judge should, in most cases, accept the jury's findings even though he may have doubts about some of their conclusions. (*Quick*, 111 Idaho at 768, 727 P.2d at 1196.)

This explanation provided by *Quick* comports fully with I.R.C.P. 59(a)(5), which mandates that the trial court judge find at least an appearance of passion or prejudice before a motion for new trial will be granted. Mere doubts, or trivial differences in determinations or amounts of award may, in fact, not present even the appearance of passion or prejudice.

When may the trial court find that the disparity between its assessment of the damages and that of the jury is either the product of passion or prejudice, or gives the appearance of being so? *Quick, supra* has set forth a standard to aid trial court judges in this difficult determination.

> [I]f the trial judge discovers that his determination of damages is so substantially different from that of the jury that he can *only* explain this difference as resulting from some unfair behavior, or what the law calls "passion or prejudice," on the part of the jury against one or some of the parties, then he should grant a new trial. How substantial this difference must be is impossible to formulate with any degree of accuracy. It will necessarily vary with the factual context of each case and the trial judge's sense of fairness and justice. Frequent characterizations have included the idea that the disparity must "shock the conscience" of the trial judge or lead him to conclude that it would be "unconscionable" to let the damage award stand as the jury set it. [Citation omitted] *Quick*, 769–70, 727 P.2d at 1197.

In sum, *Dinneen* and *Quick* suggest the following course of conduct for a trial court judge pursuant to a motion for new trial under I.R.C.P. 59(a)(5) and (6): The trial court is not merely to weigh its calculations as against those of the jury. Rather, the trial court is to weigh the evidence to determine if the jury's verdict is supportable by the evidence and when it thinks not, it should grant a new trial pursuant to I.R.C.P. 59(a)(6). If, technically, the verdict is supported by substantial, competent evidence and it still finds the verdict excessive, then it must rule whether in its opinion the jury appears to have acted under the influence of passion or prejudice. In ascertaining whether the jury appears to have so acted, the judge looks to the disparity between the awards and to whether such disparity "shocks the conscience."

*Dinneen* and *Quick* do not countenance automatic substitution of a judge's damage award for that of the jury whenever the two are disparate. Indeed, were such the case, successive new trials would be mandated until a jury returned the judge's preordained verdict whenever a judge's weighing of the evidence yielded a verdict different than that of the jury. Admittedly, such an abuse of the legal system is of extremely remote likelihood. However, such abuses are precluded altogether by adherence to the mandate of judicial deference to the jury verdict as required under *Quick*:

> [The trial judge's] figure of damages will often be different from that of the jury's. *But*, since it is a jury function to set the damage award based on its sense of fairness and justice, the trial judge must defer to the jury, *unless* it is apparent to the trial judge that there is a great disparity between the two damage awards and that disparity cannot be explained away as simply the product of two separate entities valuing the proof of the plaintiff's injuries in two equally fair ways. *Quick*, 111 Idaho 769, 727 P.2d 1197.

In the instant case, the trial court explained that *Dinneen* was the basis of its decision, despite the confusion and frustration it encountered in interpreting *Dinneen:*

> [T]he *Dinneen* case give[s] no guidance as to what significant disparity means to the point of suggesting passion or prejudice. This is very subjective and, I tell you, I think the most uncomfortable position I've felt I've ever been in. [T]he court is required to ... go through this very painstaking and troubling process. And occasionally do like I did here, *substitute my opinion for that of the jury.* (Emphasis added.)

■ Moreover, the trial court indicated that he found no fault with the jury to prompt his conditional order of new trial:

> I was impressed with the jury, I think. I thought we had a very well selected jury. I thought they were a good cross-section of age, income, occupations, intelligence, certainly conscientious. *I don't think I could say I've had a finer jury in any case* and that made me extremely uncomfortable from that standpoint, to have to go back and second-guess. But frankly I don't see any way around it under the *Dinneen* decision.... I decided I should analyze the evidence as best I could, decide what the most I felt was justified, and then see what that comparison to that verdict would indicate. (Emphasis added.)

However, the most telling comment made by the trial court judge is that "there was clearly sufficient evidence to support both the verdict in plaintiff's favor on the issue of liability *and the amount of damages awarded to him.*" (Emphasis added.)

Using commendable candor, the trial court praised this jury as being one of the best he ever had, and further specifically found that the damage evidence supported the amount of the jury's award, (he having stated that he would have awarded less on some items).

On the basis of the statements of the trial court, we cannot ascertain whether the trial court was either shocked by the jury's award, or whether it found that award unconscionable. Rather, the trial court merely substituted its award amount, reached by way of a different method of calculation, for that of the jury. The trial court made no finding that the amount of the jury verdict "appeared to have been given under the influence of passion or prejudice." Therefore, the order granting remittitur or new trial is set aside. We remand to the trial court so that it may enter findings of fact as to whether he was, in fact, shocked by the jury award, or found such award unconscionable so as to have the appearance that it was given under the influence of passion or prejudice. Following entry of those findings, the trial court may either re-institute the remittitur, or not do so, whichever is appropriate and consistent with this opinion.

## II. OSHA VIOLATIONS AS NEGLIGENCE PER SE

Next, respondent Bennett Creek Farms asserts error resulting from jury instructions 18 & 19, which instructed that violations of two safety standards adopted by the Federal Occupational Safety and Health Administration (OSHA) would constitute negligence as a matter of law.

Instruction No. 18 cited the standard expressed in 29 C.F.R. § 1928.57(6),[2] while Instruction No. 19 was based upon 29 C.F.R. § 1928.57(11).[3]

---

**2.** 29 C.F.R. § 1928.57(6) provides:

> At the time of their initial employment and at least annually thereafter the employer shall instruct every employee in the safe operation and servicing of all equipment with which the employee will be involved, and at least the following safe operating practices should be covered:

> 1. stop engine, disconnect the power source and wait for all machine movement to stop before cleaning or unclogging the equipment;
> 2. make sure everyone is clear of the machine before starting the engine, engaging power or operating the machine.

**3.** 29 C.F.R. § 1928.57(11) provides:

Both standards require that an employer must follow several safe operating practices, namely that any engine or power source must be disengaged during servicing, cleaning or unclogging, and that the employer must be sure that all persons are clear of the machine before reengaging power.

Bennett Creek Farms argues that allowing the jury to find negligence *per se* from the violation of the OSHA standards was prejudicial error. Respondents ground their argument in certain limiting language contained in the Occupational Safety and Health Act of 1970 (OSHA). Section 653(b)(4) of that act provides:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases or death of employees arising out of, or in the course of, employment.

The question of whether the violation of the regulations promulgated by OSHA constitutes negligence as a matter of law in Idaho is one of first impression.

In reaching our decision, we first note that, in Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed, and that violations of such statutes and regulations may constitute negligence *per se*. *Brizendine v. Nampa & Meridian Irrigation Dist.*, 97 Idaho 580, 586, 548 P.2d 80 (1976); *Riley v. Larson*, 91 Idaho 831, 832, 432 P.2d 775 (1967); St. *Ex. rel. McKinney v. Richardson*, 76 Idaho 9, 277 P.2d 272 (1954).

■ Several criteria must, however, be met before negligence as a matter of law will be found. First, the statute or regulation must clearly define the required standard of conduct (*Brizendine*, 97 Idaho at 586, 548 P.2d at 80); second, the statute or

regulation must have been intended to prevent the type of harm defendant's act or omission caused (*Stephens v. Stearns*, 106 Idaho 249, 257, 678 P.2d 41 (1984); third, the plaintiff must be a member of the class of persons the statute or regulation was designed to protect (*Stephens*, 106 Idaho at 257, 678 P.2d at 41); and fourth, the violation must have been a proximate cause of the injury. (*Leliefeld v. Johnson*, 104 Idaho 357, 370, 659 P.2d 111 (1983).

■ In the instant case, all of the above criteria have been met. The OSHA regulations are clear and explicit. They were . designed to "assure ... every working man and woman in the Nation safe and healthful working conditions," (29 U.S.C. § 651(b) (1970)), thereby meeting the second and third criteria for findings of negligence *per se*. Lastly, the violation of leaving the PTO engaged while Sanchez was working to unclog the harvester was the proximate cause of Sanchez's injury.

Respondent Bennett Creek Farms nonetheless argues that, allowing violations of OSHA regulations to be used in finding negligence per se circumvents the express directive of 29 U.S.C. § 653(b)(4), which requires that OSHA regulations not be used "to enlarge or diminish or effect in any ... manner the common law or statutory rights, duties, or liabilities of employers...."

The courts are divided on this issue. The decided majority and modern trend is, however, to allow OSHA regulations to be used to establish negligence *per se* when the plaintiff is an employee of the defendant.

Most recently, the Fifth Circuit Court of Appeals reiterated this view:

> "In *Melerine v. Avondale Ship Yards, Inc.*, 659 F.2d 706, 710–12 (5th Cir.1981), we held that OSHA regulations provide evidence of the standard of care exacted of employers, and thus may only be used to establish negligence per se when the plaintiff is an employee of the defend-

Whenever a moving machinery part presents a hazard during servicing or maintenance, the engine shall be stopped, the power source

disconnected, and all machine movement stopped before servicing or maintenance is performed.

ant.... In *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1238 and note 15 (5th Cir.1982), we reiterated that a violation of an OSHA regulation can be evidence of negligence or even, in appropriate circumstances, negligence *per se*...." (*Dixon v. International Harvester Co.*, 754 F.2d 573, 581 (5th Cir. 1985)).[4]

Applying Tennessee law, under which a breach of duty imposed by statute or regulation is negligence *per se* if the plaintiff injured is a member of the class of persons the statute or regulation was designed to protect, the Sixth Circuit Court of Appeals held that it was error not to instruct on negligence *per se* based upon a violation of the OSHA General Duty Clause. *Teal v. E.I. DuPont DeNemours Co.*, 728 F.2d 799 (6th Cir.1984).[5]

In the instant case, the General Duty Clause is not implicated. Rather, by violating OSHA regulations 29 C.F.R. § 1928.57(6) and 29 C.F.R. § 1928.57(11), Bennett Creek Farms violated "specific duties" established under OSHA. The *Teal* court noted that:

"The specific duty clause, [§ 654(a)(2)] represents the primary means for furthering Congress' purpose of assuring "so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). (*Teal* 728 F.2d at 804).

An employer is covered under the specific duty provision if the employer has "control of the work place and opportunity to comply with the OSHA regulations." (*Teal* 728 F.2d at 804). There can be no serious argument that Bennett Creek Farms did not control its work place, nor that it lacked the opportunity to comply with the OSHA regulations in question.

Bennett Creek Farms relies, in main, upon a case arising out of the Supreme Court of Connecticut, *Wendland v. Ridgefield Construction Services, Inc.*, 184 Conn. 173, 439 A.2d 954 (1981). *Wendland* holds that the provisions of 29 U.S.C. § 653(b)(4) preclude instructions of negligence *per se* arising out of OSHA violations.

"A negligence per se instruction transforms the character of the factfinder's inquiry. The applicable standard of care is affected by such an instruction. Because the standard of care is the key factor in determining liability, we conclude that the application of a negligence per se instruction affects common law rights, duties and liabilities of employers and employees with respect to injuries of employees arising out of an in the course of employment as those terms are used in 29 U.S.C. § 653(b)(4)...." (*Wendland*, 184 Conn. at 173, 439 A.2d at 956–57).

*Wendland* relied upon various Fifth Circuit opinions (later superseded by *Melerine* and *Dixon*) and discredited those cases which allowed OSHA violations to constitute negligence *per se*, stating:

"While it is true that some courts have held that OSHA violations constitute negligence per se, we do not find these decisions persuasive because these opinions have not confronted a statute analogous to 29 U.S.C. § 653(b)(4)...." (*Wendland*, 184 Conn. at 173, 439 A.2d at 957).

While such may have been the case at the time *Wendland* was decided, subsequent cases have both interpreted § 29 U.S.C. § 653(b)(4) and allowed instructions on negligence *per se* pursuant to violations of OSHA regulations. Indeed, the common interpretation of 29 U.S.C. § 653(b)(4) has merely been to construe its language as precluding the creation of a new civil cause of action against either a plaintiff's employ-

---

**4.** *See also Kelley v. Howard S. Wright Construction Co.*, 90 Wash.2d 323, 582 P.2d 500 (1978); *Koll v. Manatt Transportation Co.*, 253 N.W.2d 265 (Iowa 1977).

**5.** In order to establish a violation of the OSHA General Duty Clause, which covers unantic-

ipated hazards not covered by specific OSHA regulations, the plaintiff or Secretary of Labor must show a hazard, of which the employer knew or should have known, was causing or likely to cause death or serious bodily injury. 29 U.S.C.A. § 654(a)(1). (*Teal,* 728 F.2d at 804).

er or a third party who is not the plaintiff's employer. (*See Melerine v. Avondale Ship Yards, Inc.*, 659 F.2d 706, 709 (5th Cir. 1981); *Barrera v. E.I. DuPont and De-Nemours & Co.*, 653 F.2d 915, 920 (5th Cir.1981); *Kelley v. Howard S. Wright Construction Co.*, 90 Wash.2d 323, 582 P.2d 500, 507 (1978); *Otto v. Specialties, Inc.*, 386 F.Supp. 1240, 1242 (N.Dist.Miss. 1974).)

Of the above, only *Otto* held that, applying Mississippi law, violations of OSHA regulations could not be used to prove negligence as a matter of law. That case has, however, been expressly discredited by the Fifth Circuit in *Dixon, supra.*[6]

It is not, however, the dearth of supporting case law for respondents' argument which decides the issue. More importantly, we are persuaded that the intent of Congress in enacting OSHA, namely "to assure safe and healthful working conditions for every man and woman in the Nation," can best be served by allowing instructions of negligence *per se* for violations of OSHA regulations. As noted in *Teal*, the specific duties imposed on employers by OSHA regulations are the primary means for furthering the intent of Congress in enacting OSHA.

The OSHA regulations are in force in Idaho, as in the rest of the Nation. Moreover, Idaho law has, as a long-standing rule, allowed instructions of negligence *per se* in given circumstances. As we have already noted, all of the criteria for a finding of negligence *per se* in Idaho have been met. Accordingly, the trial court's instructions to the jury, Nos. 18 and 19, were not erroneous.

## III. THE POSSIBLE ADMISSION BY THE INSURANCE CLAIMS ADJUSTER

The third issue on appeal concerns the trial court's statements to the jury allowing

them the inference that certain statements contained in the notes of defense expert Dr. Blotter were made by an agent of the defendants.

The statement in question was made by one of four persons, either Gary Smith (Bennett Creek Farms' foreman, Anderson's supervisor); Bill Batt (one of Bennett Creek Farms' attorneys); Sandee Hagen (an adjuster with Safeco Insurance Company, Bennett Creek Farms insurer); and/or Lonnie Ludiker, a photographer, resulting in the following notation by Dr. Blotter: "Tractor driver admits negligence in not shutting off PTO." Unfortunately, Dr. Blotter does not recall which of the four made the statement.

Of course, the purported statement by Rusty Anderson, made out of court and offered for its truth, is inadmissible hearsay unless it falls under one of the recognized exceptions to the hearsay rule. If the statement was made by Gary Smith, it would be an admission of an agent, *Hilbert v. Spokane International Railroad Co.*, 20 Idaho 54, 116 P. 1116 (1911) and admissible. If made by Bill Batt, it would likewise be admissible, as admissions of counsel are tantamount to admissions of the party. *Quirk v. Bedal*, 42 Idaho 567, 248 P. 447 (1926).

The question becomes more problematic if the statement was made by insurance claims adjuster Sandee Hagen. At first blush, it is evident that the relationship between an insurance claim adjuster representing the insurer to the insured (Bennett Creek Farms/Rusty Anderson) is a much more tenuous one than that between employer and employee (Smith) or attorney to client (Batt). (Although it appears that, here, Sandee Hagen worked directly for the insurer, Safeco, rather than for a separate adjusting company, this somewhat less tenuous tie to the insured, Bennett Creek

**6.** "[T]he *Lenoir* panel relied upon *Otto v. Specialties, Inc.*, 386 F.Supp. 1240, 1245 (N.Dist. Miss.1974), in which the court refused to admit OSHA standards as either conclusive proof or evidence of negligence, because 'the Supreme Court of Mississippi would be persuaded ... to refuse to permit the utilization of OSHA safety standards....' The district court's reliance upon state law, however, was misplaced because federal law governs the admissibility of evidence in diversity cases." (*Dixon*, 754 F.2d at 581–82, fn. 5).

Farms, still does not suffice to establish an agency relationship between the two.) The interests of insurer and insured are often at odds during the course of litigation; particularly so before trial. During settlement, the insurer may have little incentive to fully represent the insured once policy limits have been exceeded. Conflicts of interest between insurer and insured, while not the norm, are nonetheless commonplace. *San Diego Fed. Credit Union v. Cumis Ins. Society*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (1984); *Nike, Inc. v. Atlantic Mutual Ins. Co.*, 578 F.Supp. 948 (1983); *Previews, Inc. v. California Union Insurance Co.*, 640 F.2d 1026 (9th Cir. 1981); *Employer's Fire Insurance Company v. Beals*, 103 R.I. 623, 240 A.2d 397 (1968); *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 154 Cal.Rptr. 104, 419 P.2d 168 (1965); *Prashker v. United States Guarantee Co.*, 1 N.Y.2d 584, 154 N.Y.S.2d 910, 136 N.E.2d 871 (1956).

Without touching upon the myriad ethical considerations implicit in the insurer/insured relationship, it is sufficient to note, as we do, that the interests of insurer and insured are discrete and that statements of employees of the insurer should not be viewed as statements made by an agent of the insured. We conclude that the better reasoned approach calls for the exclusion of the statement, since the interests of insurer and insured do diverge to such an extent that Sandee Hagen, as an insurance claims adjuster, cannot reasonably be viewed as an agent of the insured. Accordingly, if the statement was made by Sandee Hagen, it was inadmissible hearsay.

Assuming that the statement was made by Sandee Hagen, and without touching on the issue of multiple hearsay arising from Dr. Blotter's recordation of Sandee Hagen's supposed statement, the trial court

erred in allowing Dr. Blotter's notes to be considered by the jury. However, we deem the error harmless, pursuant to I.R.C.P. 61.[7] We can find no prejudice to Bennett Creek Farms where, as here, there was such an overwhelming showing made of defendant's negligence and ultimate liability.

## IV. THE ADMISSIBILITY OF A PRIOR CONSISTENT STATEMENT

Next, Bennett Creek Farms argues that the trial court's failure to admit as evidence the statement by Rusty Anderson, made prior to trial to Dick Nelson, to the effect that Rusty Anderson had never disengaged the PTO (a statement consistent with his trial testimony) was reversible error. Bennett Creek Farms argues that the statement is admissible as a "prior consistent statement" because contrary statements made by Rusty Anderson in his deposition were used to impeach his trial testimony. Respondents contend that the prior consistent statement could have been used to combat the inference of recent fabrication.

Again, however, any error was harmless and so does not warrant a reversal or new trial (I.R.C.P. 61). Defendants have not demonstrated how the admission of the statement would have affected the outcome of the trial on the issue of negligence. Indeed, to keep the PTO engaged and the equipment running while the men were unclogging the machinery would be in violation of proper safety procedures. Rusty Anderson had made several contradictory statements, at trial and in his deposition. The statement sought to be admitted was expressly contradicted by all of the other witnesses. Rather than quell an implication of recent fabrication, the admission of

---

7. I.R.C.P. 61 provides:

**Rule 61. Harmless error.**—No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, granting a

new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

the statement would have, in all likelihood, further embedded in the minds of the jurors an implication of continued fabrication on the part of Rusty Anderson. At any rate, the error was harmless.

██ Lastly, respondent Bennett Creek Farms failed to make an offer of proof of the statement in question when the trial court denied the statement's admission. Therefore, the error, even if not harmless, was not preserved for appeal.

## V. THE ADMISSIBILITY OF TESTIMONY REGARDING FUTURE LOST EARNINGS

The next issue on appeal is whether the testimony of plaintiff's economist regarding future lost earnings was properly admitted. Bennett Creek Farms contends that the testimony lacked foundation and thus should not have been admitted.

### ("Reasonable Certainty")

First, Bennett Creek Farms argues that plaintiff's economist, Dr. Ben-Zion, did not adequately verify past employment information given him by Sanchez, and that such information was therefore suspect, since Sanchez was an interested party and could easily have falsified his records. Because of this, respondent argues, the final damage calculation for future lost earnings could not have provided the court with the requisite "reasonable degree of certainty." *Rindlisbaker v. Wilson,* 95 Idaho 752, 761, 519 P.2d 421 (1974).

██ However, "reasonable certainty" in the context of assessing damages for future lost earnings requires "only that the damages be taken out of the realm of speculation." *Circle C Ranch Co. v. Jayo,* 104 Idaho 353, 356, 659 P.2d 107 (1983); *Lamb v. Robinson,* 101 Idaho 703, 705, 620 P.2d 276 (1980). Sanchez was entitled to present his earnings history to his economist. If defendants wished to question the data, they could have done so either through discovery or cross-examination of Sanchez. They cannot establish a lack of

foundation by merely asserting on appeal that the data "may not have been correct."

Additionally, appellants argue the jury was well aware of the basis of Dr. Ben-Zion's opinion. Any questions as to credibility of such would have been reflected in the verdict. "[T]he weight of such evidence was for the jury." *Meissner v. Smith,* 94 Idaho 563, 570, 494 P.2d 567 (1972).

In the instant case, Sanchez contends that Dr. Ben-Zion did, in fact, verify Sanchez's employment information. The jury was presented with the trial testimony of Dr. Ben Zion noting the relation between Sanchez's personal wage information and the statistical data for other farm employees. Moreover, Dr. Ben-Zion was asked specifically whether he had "assumed" Sanchez was "telling the truth" and responded that he had "no reason to assume otherwise."

Under such circumstances we cannot state, as a matter of law, that it was an abuse of discretion for the trial court to admit the testimony. The credibility of Dr. Ben-Zion's testimony was specifically before the jury and they answered with their verdict.

### (Age Earnings Factor)

██ Next, Bennett Creek Farms argues that Dr. Ben-Zion improperly relied upon the "age earnings factor" in increasing his calculations of the damage to Sanchez by $330,000. Respondent argues that, while the "age earnings factor" (whereby it is assumed that the earnings of a worker increase during the work life) may have some validity in assessing future earnings for certain occupations (i.e. doctors, lawyers), its usefulness in assessing those of a migrant farm worker is questionable.

Conversely, Sanchez argues that the age earnings factor used by Dr. Ben-Zion in calculating a total of $770,000 in lost future earnings was a broadbased composite of all male U.S. workers, including farm laborers, done by the Social Security Administration. Sanchez also notes that respondents presented no evidence discrediting

the age earnings factor used. The use of the data as an appropriate econometric tool was vouched for by the economist, and the weight to be given it was a matter for cross-examination or countering by defendants' experts.

We conclude that the age earnings factor used was not, absent concrete evidence to the contrary, so inherently unreliable that its admission was, as a matter of law, an abuse of discretion by the trial court.

## VI. THE PROPRIETY OF USING VETERANS ADMINISTRATION, SOCIAL SECURITY ADMINISTRATION, AND BUREAU OF LABOR STATISTICAL DATA

Dr. Ben-Zion employed various statistics compiled by the Veterans Administration, Social Security Administration and Bureau of Labor Statistical Data in reaching an opinion on the probable impairment of Sanchez's earning capacity. According to the V.A. tables, an "average" individual with the same injury as that suffered by Sanchez will encounter a 70% "impairment in earning capacity."

Respondents argue that Dr. Ben-Zion, an economist, was not qualified to provide a disability rating, since such would entail a medical understanding of the nature and extent of Sanchez's injury.

Sanchez argues that Dr. Ben-Zion did no such thing. Rather, he merely translated the information given him on Sanchez's injury by doctors Kloss and Hurst "stating that Sanchez had suffered total impairment of his dominant hand" to monetary terms by employing the tables. Any medical analysis was done by the doctors and, necessarily, by the framers of the V.A. tables.[8]

◼ Respondents' authority, *Lamphere v. Agnew*, 94 N.M. 146, 607 P.2d 1164 (App. 1979) (cert. den., 94 N.M. 628, 614 P.2d 545), barred testimony of an expert economic witness for lack of proper foundation where there was no medical testimony

regarding percentage of disability and the economist translated specific injuries into quantifiable future loss. In the instant case, any translation was done by the tables themselves. The testimony of doctors Kloss and Hurst more than adequately defined the extent of Sanchez's injury; namely, that despite all medical efforts, appellant did not, and would never have, any useful function in his dominant hand in terms of an occupation. We are persuaded that such testimony presents adequate foundation for the application of V.A. statistics based on total disability of the dominant hand.

Dr. Ben-Zion's resulting application of the tables, in conjunction with his assessment of the likelihood of Sanchez finding employment of a non-manual nature, were proper.

## VII. PREJUDICE TO RESPONDENTS DUE TO SURPRISE

Bennett Creek Farms next contends that the trial court abused its discretion in failing to grant its motion for new trial on grounds of surprise after Dr. Ben-Zion used the V.A. disability studies as a basis for his opinion, which use it states he had not disclosed in deposition. Respondents allege they were, therefore, unable to adequately attack the very basis of Dr. Ben-Zion's trial opinion.

◼ The record reflects that Dr. Ben-Zion neither concealed nor disclosed the fact that he would use such tables in reaching his opinion. The record also reflects the fact that counsel for respondents failed to state a question in deposition specifically designed to elicit such information. Indeed, no question specifically asked Dr. Ben-Zion for his opinion and its complete basis.[9] Any surprise, then, is directly due to respondents own lack of trial preparation.

---

8. We note that the validity of the V.A. tables themselves is unquestioned.

9. In his deposition, he testified that the loss was $543,540 and provided counsel with his method of calculation on a worksheet which was appended to the deposition.

Moreover, even if we were to find error in the admittance of the tables, such error would have been harmless due to its lack of prejudicial effect upon respondents. (I.R.C.P. 61). While the trial court found that respondents were genuinely surprised by the use of the V.A. tables at trial, the court also stated that, in its opinion, the use of the tables had relatively little effect upon the verdict:

> Even the evidence from defendant's expert, Dr. Janzen, would support an award for future lost earnings to some extent. In addition, the testimony of Dr. Hurst and Dr. Kloss may have had a significant impact on this aspect of the verdict. Most significant of all may have been the testimony of the plaintiff himself, and the weight the jury placed upon it. The jurors were instructed that they did not have to accept the testimony of any of the experts, and could give it the weight they felt it was entitled to. This would have included the testimony of Dr. Ben-Zion as to the V.A. study. Therefore, it appears unlikely that the testimony which surprised defendants had any significant effect on the overall verdict.

Finally, the significance of the alleged "surprise" issue to respondents seems to lack credence, given that respondents neither objected nor moved for continuance when the V.A. tables were presented at trial. Rather, the issue first arose upon a post trial motion. Thus, no error was preserved for appeal.

We hold that the trial court did not abuse its discretion in failing to grant a new trial due to surprise.

## VIII. ADMISSIBILITY OF PLAINTIFF'S ALIENAGE STATUS

Respondents next contend that they were denied an opportunity to effectively cross-examine Dr. Ben-Zion regarding damage to Sanchez, as a result of the trial court's grant of a motion *in limine* precluding mention of Sanchez's status as an illegal alien. Respondents argue that such status impacts directly on the issue of damages, since, as an illegal alien, Sanchez was subject to deportation. Therefore, there was no guarantee that he would have continued to receive wages at rates applicable in the United States. The jury, respondents argue, should have been presented with evidence regarding probability of deportation and the differences in average wages between farm workers in Mexico and the United States. Therefore, defendants allege reversible error due to the granting of the motion *in limine.*

A similar situation was presented to this Court in *Patino v. Grigg & Anderson Farms,* 97 Idaho 251, 542 P.2d 1170 (1975). Patino was an illegal alien injured while working on a potato combine on a farm near Rupert.

In *Patino,* the jury was instructed on United States mortality statistics, immigration laws and federal minimum wage laws. The appellants therein argued that the jury instructions allowed the jury to speculate that plaintiff would remain in the United States and reward him for his illegal entry into this country. This Court stated:

> Appellants would have us substitute an instruction gauging plaintiff's damages in terms of income in his native country of Mexico. It is well settled that damages for loss of earnings or profits must be shown with reasonable certainty and that compensatory awards based upon speculation or conjecture will not be allowed. *Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974). In the present case the plaintiff-respondent suffered serious permanent injuries. The jury had many factors to evaluate when it assessed damages for those injuries. The factors listed in the instructions objected to by appellant were to be considered with all of the evidence. Among the evidence before the jury was the fact that the plaintiff remained in the United States at the time of trial and had held two farm related jobs before his accident, both of which paid more than the federal minimum wage for farm workers. There was no evidence of plaintiff's wages in Mexico.

We find that the instructions objected to were neither speculative nor conjectural. 97 Idaho at 254, 256, 542 P.2d at 1170.

In the instant case, Sanchez had been in the United States more than six years at the time of trial. To remand this case for new trial to permit the jury to consider whether Sanchez would or would not have remained in the United States' work force would be to invite mere speculation. The fact is that Bennett Creek accepted the benefits of his labors as an illegal alien and it is anomalous for defendant to complain about his being compensated on the basis of the wages he was receiving.

## IX. LOSS OF HOUSEHOLD SERVICES

■ Respondent next asserts that Dr. Ben-Zion's testimony regarding the value of Sanchez's lost household services was without foundation and should not have been admitted.

The record reflects that Sanchez did testify regarding the impairment of his ability to perform household activities. In fact, a videotape depicting a day in his life was admitted into evidence, without objection, specifically detailing his difficulties with day-to-day activities.

Idaho law provides that the measure of damages is ordinarily such as will compensate for loss or prejudice suffered. *Beal v. Mars Larsen Ranch Corp.*, 99 Idaho 662, 586 P.2d 1378 (1978). Moreover, there is no set standard for measuring the value of human health or happiness. *Swanson v. U.S. By and Through Veterans Administration*, 557 F.Supp. 1041 (D.C.Idaho 1983).

Dr. Ben-Zion, as an expert economist, used various statistics provided by the Bureau of Labor to place a value on Sanchez's loss. The statistics indicated a $3,000 yearly loss for males totally disabled as to household functions. This figure was then multiplied by Sanchez's fifty-one year life expectancy, yielding a total damage estimate of $153,000 for loss of household services. Sanchez's own testimony more than adequately provided a foundation upon which Dr. Ben-Zion could apply the statistics provided by the Bureau of Labor. Such testimony was, therefore, admissible.

## X. POST JUDGMENT INTEREST

Finally, the parties have raised the issue of what, if any, post-judgment interest is owed Sanchez. That issue is not yet ripe for resolution in light of the remand ordered in Part I of this opinion.

Costs to appellant. No attorney fees awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

BISTLINE, Justice, specially concurring.

While I fully concur in the majority opinion, I feel that it is helpful to look to the actual damage assessments of both the court and jury.

A review of the record establishes that the assessment of damages by the trial court and the jury were not so disparate as to suggest passion or prejudice. Those findings were:

THE VERDICT IN SANCHEZ v. GALEY

| Calculations in the Memorandum Decision As Found by Judge Rowett | The Evidence Presented to the Jury |
|---|---|
| –$100,000 Actual Medicals | –$153,000 Loss of Household Services ($3,000 per year for 51 year life expectancy) |
| –$ 30,000 Future Medicals | |
| –$ 21,000 Wages Already Lost | –$770,000 Lost Future Wages (Includes $330,000 added when "wage earnings factor" applied, and is based upon 70% impairment assessment taken from VA Tables) |
| –$ 25,000 To Buy Special Devices | |
| –$ 50,000 Disfigurement and Loss of Enjoyment of Life | |
| –$210,000 Lost Future Wages | –$100,000 Actual Medicals |
| –$ 10,500 Repatriation to Labor Force | –$ 30,000 Future Medicals |
| –$300,000 Past Pain & Suffering | –$ 21,000 Lost Wages |
| –$200,000 Future Pain & Suffering | –$276,000 Past/Future Pain & Suff.(?) |
| **$946,500 Total** | **$1,350,000 Total** |

The trial court awarded $500,000 for past and future pain and suffering. If the jury awarded 100% of proven special damages, their finding for pain and suffering would, at most, be $276,000—a conservative sum in light of the trial court's findings.

The trial court reached a damage assessment of $210,000 for lost future wages, which sum was based on the court ascribing a 50% impairment rating to Sanchez (there is no evidence in the record supporting such a rating) and multiplying $5,250 (50% of Sanchez's $10,000 yearly earnings) by forty years future work expectancy. There was conflicting evidence presented regarding Sanchez's ability to be repatriated into the work force, some of which makes it doubtful that Sanchez could ever be successfully repatriated, given his limited educational background and present inability to handle physical labor of any kind.

Evidence presented to the jury by Dr. Ben-Zion would support a finding of up to $770,000 for lost future wages. (This figure includes $330,000 added due to the "age earnings factor," and is also, in part, based on a 70% impairment rating of Sanchez, taken from VA Medical Tables.)

Additionally, the trial court appears to have totally discounted evidence presented which would support a finding of $153,000 for loss of household services.

After comparing the damage calculations of the court and jury, I cannot conclude that the jury's assessment in any way appears to have been made as a result of passion and prejudice. It appears the differences are occasioned upon the weight to be given various competent calculation of damages. There is nothing to suggest this was either a run-away or unreasonable jury. Accordingly, I concur in the majority opinion.

BAKES, Justice, dissenting in part:

Justice Huntley's opinion attempts to place an unwarranted and unnecessary gloss on the standard contained in I.R.C.P. 59(a)(5) for awarding new trials based on excessive or inadequate damages. In so doing, the opinion disregards the clear language of Rule 59(a)(5) and our decision in *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979), recently reaffirmed in *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986). The result is a less than clear analysis of the standards to be applied by trial courts in evaluating motions for new trial under I.R.C.P. 59(a)(5). As written, the Court's opinion will only confuse bench and bar alike.

I believe the trial court did not err in granting the remittitur or, in the alternative, a new trial. Accordingly, the judgment and orders of the district court should be affirmed.

I

The Court's opinion purports to rely on the case of *Quick v. Crane, supra,* to support its decision in the present case. It assumes that our opinion in *Quick* has altered the *Dinneen* standard, changing it from an "appearance of passion or prejudice" test to a "shocks the conscience" test. However, there is nothing in the *Quick* opinion which supports that assumption. *Quick* did nothing more than reaffirm our holding in *Dinneen v. Finch, supra,* stating that "in ruling upon a motion for a new trial [under Rule 59(a)(5)] premised upon inadequate or excessive damages, the rule a trial court must follow is set forth in *Dinneen v. Finch,....*" 111 Idaho at 768, 727 P.2d at 1196. Our opinion in *Quick* then quotes, directly from *Dinneen,* the following language:

> "Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive 'as a matter of law.' (Citation omitted.) Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial. (Citations omitted.)" 100 Idaho at 625–626, 603 P.2d at 580–81 (emphasis in original).

The *Quick* opinion further reaffirms the holding in *Dinneen* that whether the disparity between the judge's determination of damages and the jury's determination of damages is sufficient to merit a new trial is a decision left entirely to the discretion of the trial court.

> "How substantial this difference must be is impossible to formulate with any degree of accuracy. It will necessarily vary with the factual context of each case and the trial judge's sense of fairness and justice. Frequent characterizations have included the idea that the disparity must 'shock the conscience' of the trial judge or lead him to conclude that it would be 'unconscionable' to let the damage award stand as the jury set it. (Citations omitted.) These characterizations, of course, do little more than restate *the trial judge's discretionary perspective* but are, nonetheless, frequently employed in other areas of the law and, therefore, *may* be useful to the trial judge." *Quick v. Crane, supra* 111 Idaho at 769–70, 727 P.2d at 1197–98, (emphasis added).

As the language in the above statement indicates, the *Quick* opinion in no way changes or modifies the *Dinneen* standard. As we held in *Dinneen,* and reaffirmed in *Quick,* once such discretion is exercised our review on appeal is limited merely to determining whether or not that discretion has been abused.

Herein lies the error in the Court's opinion in the present case. Although purporting to abide by the *Dinneen* standard of review on appeal, *i.e.,* abuse of discretion, the opinion fails to indicate in what manner the trial judge in the present case has abused his discretion in ruling on a motion for new trial under I.R.C.P. 59(a)(5). The Court never once finds that the trial judge abused his discretion. Absent such a finding, I fail to see on what basis this Court may reverse the trial judge's considered decision and remand for further proceedings. The decision to reverse and remand appears to be based entirely upon the conclusion that this Court is unable to determine whether the trial court properly applied the *Dinneen* standard to the facts of this case. This conclusion is expressed in the following statement: "We cannot ascertain whether the trial court was either shocked by the jury's award or whether it found that award unconscionable." *Ante* at 616, 733 P.2d at 1241. However, as *Dinneen* explains, the express language of I.R.C.P. 59(a)(5) adopts the "passion or

prejudice" standard, not a "shock the conscience" or "unconscionable" test for determining whether the disparity between the award determined by the trial judge and jury is so great as to merit the granting of the motion for new trial under 59(a)(5). Neither *Dinneen* nor *Quick* nor the express language of I.R.C.P. 59(a)(5) require that a trial judge use such a "shock the conscience" test in ruling upon such motions. I find it difficult to understand how in the present case there can be any finding that the trial judge abused his discretion in ruling on a motion for new trial under 59(a)(5) simply because he did not use the magical phrase "shock the conscience."[1]

The court's opinion assumes that the trial court abused its discretion, holding that it is unable to ascertain whether "the trial court was shocked by the jury's award or whether it found that amount unconscionable." That statement is curious, given the fact that the trial court did make such a finding of unconscionability. In the present case the trial court specifically found that he could not *"in good conscience,* come within $400,000 of the jury's verdict." It is abundantly clear that the trial court implicitly found the appearance of passion or prejudice based on a difference between damage amounts awarded by himself and the jury which he classified as "a substantial difference." The trial judge specifically stated in open court that he thought that the 30% difference between his award of $950,000 and the jury's award of $1.35 million "would certainly be considered sufficient" for purposes of supporting a finding of the appearance of passion or prejudice as required by the express language of I.R.C.P. 59(a)(5) and this Court's decision in *Dinneen.*

Given the *Dinneen* standard and this Court's explicit holding in *Quick v. Crane, supra,* that "[h]ow substantial this difference [between judge and jury assessment of damages] must be is impossible to formulate with any degree of accuracy," and

that "it will necessarily vary with the factual context of each case and the *trial judge's* sense of fairness and justice," *Quick* at 769, 727 P.2d at 1197. I fail to see how this Court can hold that the trial judge has failed to carry out his duty as required by *Dinneen* in ruling on a motion for new trial under 59(a)(5). He has not abused his discretion, and any implicit finding to the contrary by the Court today is without foundation in the law or the record in the present case.

The Court's opinion is critical of *Dinneen* based upon a most unwarranted assumption, reflected in the Court's statement, *ante* at 614, 733 P.2d at 1239, that "the most confusing aspect of *Dinneen* is its *intimation* that, after the trial court has weighed the evidence and reached its determination, its determination is then of equal parity with that of the jury." (Emphasis added.) There is no such "intimation" in Justice Bistline's opinion in *Dinneen.* That opinion clearly provided that only if the difference between the court's evaluation of damages and the jury's evaluation of damages was so great as to suggest the influence of passion or prejudice on the part of the jury, was the trial court authorized to grant the motion for new trial, or a remittitur of damages.

In the several cases which have followed *Dinneen* in the last year which are discussed in more detail hereinafter, including *Black v. Reynolds,* 109 Idaho 277, 707 P.2d 388 (1985), which was authored by the author of today's opinion, there was no suggestion that *Dinneen* "intimated" that the determination of the trial judge was "of equal parity with that of the jury." The Court today finds this assumed "intimation" in *Dinneen,* and then concludes that "the trial court (Judge Rowett) merely substituted its award amount, reached by way of a different method of calculation, for that of the jury." There is absolutely nothing in the record to support that statement.

---

1. In two cases decided in just the last year, *Black v. Reynolds,* 109 Idaho 277, 707 P.2d 388 (1985), and *Vannoy v. Uniroyal,* 111 Idaho 536, 726 P.2d 648 (1986), we affirmed the trial court's *Dinneen* analysis which neither applied nor mentioned the "shock the conscience" or "unconscionable" test.

On the contrary, Judge Rowett stated that the disparity between what the jury awarded, and what he would have awarded, was such "a substantial difference" that he could not "in good conscience come within $400,000.00 of the jury's verdict." There is absolutely no justification for the Court's assumption that Judge Rowett merely substituted his opinion for that of the jury.

We never presume error on appeal. *Carpenter v. Double R Cattle Co., Inc.,* 108 Idaho 602, 701 P.2d 222 (1985); *Woods v. Crouse,* 101 Idaho 764, 620 P.2d 798 (1980). The appellant always bears the burden of proving that the trial court committed error. *Dawson v. Mead,* 98 Idaho 1, 557 P.2d 595 (1976) ("It is fundamental that error will not be presumed, but must be shown affirmatively by the appellant on the record."). This is a particularly heavy burden in those cases where the issue to be reviewed on appeal is whether the trial court abused its discretion, which is the standard involved in reviewing the trial judge's action on a motion for new trial under Rule 59(a)(5). *Dinneen v. Finch, supra; Black v. Reynolds, supra.* The Court's opinion today does just the contrary. It "intimates" a misinterpretation of *Dinneen, ante* at 619, 733 P.2d at 1244, and then assumes an erroneous evaluation by the trial court, *ante* at 616, 733 P.2d at 1241.

The error in today's opinion becomes more obvious when it is contrasted with the facts, analysis, and result reached in *Black v. Reynolds,* 109 Idaho 277, 707 P.2d 388 (1985), and *Vannoy v. Uniroyal,* 111 Idaho 536, 726 P.2d 648 (1986), two similar cases decided in the last year. In *Black v. Reynolds, supra,* the trial court, in ruling on a Rule 59(a)(5) motion for new trial or remittitur for excessive damages, stated that he had "the opportunity to weigh the demeanor, credibility and testimony of the witnesses." However, the trial court made no express determination of what he would have awarded, or whether there was any appearance of passion or prejudice, or whether the jury's award "shocked the conscience." Thus, in *Black v. Reynolds, supra,* the trial court failed to comply with

any of the directives set forth in the present opinion, *i.e.,* he did not employ the *Dinneen* standard of appearance of passion or prejudice (making his own determination of damage award and comparing it with the jury's) nor did he utilize the "shock the conscience" standard which the Court's opinion in the present case appears to hold is required in ruling on a motion for new trial under 59(a)(5). Nevertheless, Justice Huntley, writing for this Court in affirming the trial court in *Black,* stated that "this Court cannot conclude, as a matter of law, that the trial court abused its discretion in denying the motion for a new trial on the ground the verdict was excessive." *Black v. Reynolds,* 109 Idaho at 277, 707 P.2d at 388. A special concurring opinion stated that we could not assume that the trial court had "eschewed" his *Dinneen* duty, and that by the trial court merely stating that it had "the opportunity to weigh the demeanor, credibility and testimony of witnesses," that "most will see the statement as tantamount to saying that the evidence was weighed just as it would have been in a trial to the court, and no such great disparity was found to exist as to suggest the influence of jury passion or prejudice." *Black v. Reynolds,* 109 Idaho at 286, 707 P.2d at 397 (Bistline, J., concurring specially). In the present case, Judge Rowett's *Dinneen* analysis far exceeded that of the district court in *Black.* Not only did Judge Rowett "weigh the demeanor, credibility and testimony of witnesses," as the court did in *Black,* but he also specifically found that he could not "in good conscience, come within $400,000 of the jury's verdict." Accordingly, he granted the remittitur or, in the alternative, a motion for new trial. If the statement of the trial judge in *Black v. Reynolds, supra,* that he had "weigh[ed] the demeanor, credibility and testimony of witnesses" was "tantamount to saying that the evidence was weighed just as it would have been in a trial to the court, and no so great disparity was found to exist as to suggest the influence of jury passion or prejudice," *Black v. Reynolds, supra* at 286, 707 P.2d

at 388 (Bistline, J., concurring specially), then Judge Rowett's *express* weighing of the evidence and his stated conclusion that he could not "in good conscience, come within $400,000 of the jury's verdict," is "tantamount to saying that the evidence was weighed just as it would have been in a trial to the court, and [such a] great disparity was found to exist as to suggest the influence of jury passion or prejudice." *Black v. Reynolds, supra* at 286, 707 P.2d at 388.

In *Vannoy* this Court affirmed the trial court's granting of Rule 59(a)(5) motion for a new trial or, in the alternative, remittitur of a portion of the damages. The *Vannoy* trial court, in making his *Dinneen* analysis, stated:

> "The Court finds that the actual evidence introduced on loss of consortium was very sketchy and would not justify an award of damages in the amount of $74,-895.81. If I were sitting on the case, I would have awarded damages of $10,-000.00. I feel that the jury's decision also deserves some weight. Accordingly, I will grant defendant's Motion for a New Trial unless plaintiffs agree to reduce the damages awarded to Nadine Vannoy for loss of consortium to $20,-000.00."

The *Vannoy* case is similar to *Black v. Reynolds, supra,* even though the trial court in *Vannoy* went further and indicated how much he would have awarded in damages had he been the finder of fact, something which the court in *Black* did not do. However, the trial judge in *Vannoy* did not go as far as Judge Rowett, the trial judge in this case, who additionally stated that he could not "in good conscience, come within $400,000.00 of the jury's verdict." Apparently the trial judge in *Vannoy* was saved from error by not repeating Judge Rowett's statement that he could not *"in good conscience"* come within $400,000.00 of the jury's verdict. That makes it all the more difficult to understand how the Court today can justify reversing Judge Rowett's handling of the motion for new trial and remanding to determine whether he was "either shocked by the jury's award or whether it found that award unconscionable."

When a trial court's ruling on a motion for new trial under 59(a)(5) is appealed to this Court, our review is limited to a determination of whether or not the trial judge has abused his discretion in applying the *Dinneen* standard to the motion for new trial. In the present case, the trial court conscientiously applied the *Dinneen* standard. It is difficult to comprehend how the Court in the present case, given the trial judge's detailed application of *Dinneen* to the facts of this case, can hold that he has abused his discretion requiring reversal and remand for further consideration.

The result reached by the Court in the present case, contrasted with the result reached in *Black v. Reynolds, supra,* and *Quick v. Crane, supra,* sends conflicting signals to bench and bar alike regarding the rule governing motions for new trial under 59(a)(5). Analyzing these four cases together—*Black, Vannoy, Quick,* and *Sanchez*—we have arrived at the incongruous result that if a trial judge grants or denies a 59(a)(5) motion without giving any reasons for doing so, he will be reversed. *Quick v. Crane, supra.* However, if he becomes too detailed in his analysis he likewise will be reversed. *Sanchez v. Galey.* But if he gives only a little bit of reasoning, without becoming either too detailed or too brief, this Court will not assume that the trial court has "eschewed" his *Dinneen* duty, and we will affirm. *Black v. Reynolds, supra; Vannoy v. Uniroyal, supra.* The bar and the trial courts will surely have a difficult time understanding our decision today in this case.

II

I also dissent from Part VIII of the Court's opinion regarding the admissibility of appellant's alienage status. Citing this Court's case in *Patino v. Grigg & Anderson Farms,* 97 Idaho 251, 542 P.2d 1170 (1975), the majority holds that it was not reversible error for the trial court to preclude defendants from making any

statements before the jury regarding Sanchez's alienage status. However, the *Patino* case does not so hold; if anything, it stands for just the opposite. In *Patino* the district court had admitted evidence regarding the plaintiff's Mexican alienage status, and his illegal presence in the United States, and instructed the jury on the probability of the plaintiff being able to lawfully immigrate to the United States.[2] There was no assignment of error on appeal in *Patino* regarding the disclosure of the plaintiff's alienage status to the jury. On the contrary, the correctness of the trial court's admission of that evidence was assumed, and the only error raised was concerning an error in Instruction No. 29 in which the trial court stated that the limitation on Western Hemisphere immigration, including Mexico, into the United States was five hundred thousand when, in fact, it was only one hundred and twenty thousand. The Court in *Patino* stated that the trial court's instruction "incorrectly stated the number of immigrants allowed into this country annually from Western Hemisphere countries," but found that "this error was not prejudicial." The only relevant statement of law contained in the *Patino* case insofar as the present case is concerned is the following language. "It is well settled that damages for loss of earnings or profits must be shown with reasonable certainty and the compensatory awards based upon speculation or conjecture will not be allowed. *Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974)." *Patino v. Grigg & Anderson Farms*, 97 Idaho at 254, 542 P.2d at 1173.

While alienage status is of doubtful relevance insofar as liability is concerned, it clearly is relevant insofar as damages are concerned—in particular, future earning capacity. To permit a plaintiff, as was done in the present case, to introduce evidence regarding future earning capacity based entirely upon wages that a non-alien earns in the United States is precisely contrary to the rule of law set forth in *Rindlisbaker*. That is, awards of damages must not be based on speculation or conjecture. Given the fact in the present case that Sanchez was not a United States citizen,[3] it borders on mere speculation to assert that his future earning capacity would be equivalent to that of similarly employed United States citizens. Respondent should have been permitted to cross examine plaintiff's expert regarding his testimony of Sanchez's future earning capacity based upon the fact that Sanchez is an illegal alien. The *Patino* decision provides no basis for precluding defendants from disclosing Sanchez's alienage status to the jury insofar as the damage issue is concerned. At a minimum, the trial court erred in not permitting counsel the opportunity to examine appellant regarding his intent to remain in this country regardless of any threat of deportation.

This issue alone is sufficient to require reversal and has been given short shrift by the Court's opinion in the present case. The effect of this error, however, was largely mitigated by the trial court's ordering of a new trial conditioned upon refusal of a remittitur by plaintiff of the damages from $1.35 million to $950,000. The trial court was fully informed regarding Sanchez's alien status, and a significant portion of the reduction of the jury's award of damage by the trial court in making his determination of damages was attributed to future earning capacity. If the Court

2. Instruction No. 29 given by the court reads as follows:

"You are instructed that the Court takes judicial notice that there is no numerical limitation on the number of aliens who may lawfully enter the United States from Mexico for permanent residence, but that there is a numerical limitation of five hundred thousand aliens per year for immigrants to the United States from Western Hemisphere countries, which includes Mexico.

"You are further instructed that you may take these facts into account in determining the economic loss, if any, suffered by the Plaintiff if you find these facts applicable."

3. Sanchez's counsel candidly admitted to the trial court that Mr. Sanchez was an undocumented alien subject to deportation in the following statement: "Lorenzo Sanchez's immigration status may be a basis ... had he been apprehended ... for his deportation."

today were affirming the trial court's order of remittitur or, in the alternative granting a new trial, the failure of the trial court to permit evidence of Sanchez's alienage status would constitute harmless error. If on remand the trial court determines to grant a new trial, then evidence of the plaintiff's alienage status should be admitted in the district court as it was in *Patino v. Grigg & Anderson Farms, supra.*

SHEPARD, J., concurs.

## ON DENIAL OF PETITION FOR REHEARING

HUNTLEY, Justice.

The Petition for Rehearing by respondents asserts several objections to the above and foregoing opinion, upon two of which we comment.

First, the objection is raised, apparently picking up on a statement in the dissent of Justice Bakes, that our opinion goes beyond the standard of review established in *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986) and *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979). Such is an incorrect characterization of the majority opinion.

Our earlier opinion adopts the standard of *Quick v. Crane* without expanding it in any respect whatsoever, that is, that the standard is whether the trial court concludes that the award of the jury was the product of passion or prejudice. The references in *Quick* to "shock the conscience" and "unconscionable," which we approved of in our earlier opinion, are as follows:

> "Frequent characterizations have included the idea that the disparity must 'shock the conscience' of the trial judge or lead him to conclude that it would be 'unconscionable' to let the damage award stand as the jury set it." *Quick,* 100 Idaho 620, 727 P.2d 1197-98.

These references do not establish any new standard or test, but merely are suggestions of measuring sticks the trial court might utilize in determining whether the disparity in award is the result of passion or prejudice.

Secondly, respondents urge error in our treatment of the issue of Sanchez' alienage status, asserting that our decision herein is contrary to that required by *Patino v. Griggs & Anderson Farms,* 97 Idaho 251, 542 P.2d 1170 (1975).

We stand with our original opinion for two reasons. First, the issue would undoubtedly be moot in the event of a new trial since the passage into law on November 5, 1986, of the Immigration Reform and Control Act of 1986, Public Law 99–603. Secondly, the passage of that Act would make submission of the alienage status to a jury for consideration of future earning capacity even more speculative than it would have been prior to the passage of that Act.

The Immigration Reform and Control Act of 1986 provides for a legalization program for undocumented aliens who entered this country prior to 1982.

Mr. Sanchez had been working in this country for six years prior to the subject accident which, coincidentally, occurred in 1982.

At most, in the overall context of this case, the failure to permit testimony and consideration of the alienage status in regard to damages was harmless error. Particularly so since this matter is being sent back to the district court to reconsider the granting of a new trial or denying a new trial conditioned on the plaintiff accepting a remittitur.

DONALDSON, J., concurs.

BISTLINE, Justice, concurring in the opinion of HUNTLEY, J., on denial of petition for rehearing.

Even without the benefit of the Court's prior opinion in *Patino,* it seemed to me that the district court was entirely correct in not allowing the defense to make of Sanchez's nationality a large issue which would distract the jury from the true nuts and bolts of the case. Sanchez was injured in Idaho, and it was the laws of Idaho to

which he was subjected, as was also his employer, when he was injured.

The trial court apparently also could not see any valid reason for considering whether the injured workman in this case was from Ireland, from Japan, from India, from Australia, or from Mexico. History has taught us all well that these fifty United States are a melting pot for all nationalities.

It may be that I am remiss in my reading abilities, but if not, then perhaps in my ability to comprehend. What I get out of a number of readings of *Patino* is that Justice Donaldson, writing for a unanimous Court, held that the jury was properly informed concerning the laws of the United States which governed minimum wages in the United States—not Mexico or some other country to which Patino might later move.

BAKES, Justice, dissenting on denial of petition for rehearing:

I

In its opinion denying the petition for rehearing, the majority asserts that its initial opinion in this case does nothing to change the standards established in *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986), and *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979). The majority's opinion on denial of rehearing assures petitioners that the *Dinneen* standard for ruling on a motion for new trial under I.R.C.P. 59(a)(5) is still "whether the trial court concludes that the award of the jury was the product of passion or prejudice." *Ante* 112 Idaho at 631, 733 P.2d at 1256. The majority now asserts, in its opinion denying the petition for rehearing, that the "shock the conscience" or "unconscionable" language in its initial opinion does not establish "any new standard or test." *Ante* at 631, 733 P.2d at 1256. I agree, of course, that *Quick v. Crane, supra*, did nothing to supplant or modify this Court's decision in *Dinneen v. Finch, supra.* As noted in my dissent to the Court's initial opinion, *Quick* does not establish a "shock the conscience"

or an "unconscionable" test for determining whether a motion for new trial pursuant to I.R.C.P. 59(a)(5) should be granted. The majority, in its opinion on denial of petition for rehearing, now recognizes and accepts the position taken in the dissent on this issue. The majority opinion on denial of petition for rehearing corrects the Court's initial opinion by holding that the standards established in *Dinneen v. Finch, supra*, are the standards for determining when a 59(a)(5) motion for new trial should be granted.

However, what remains unanswered in the present case, then, is why or on what basis the majority reverses the trial court's determination that a new trial should be granted in the absence of plaintiff's acceptance of a remittitur of a portion of the damages awarded. In *Dinneen v. Finch, supra*, we expressly held that the standard of review on appeal of a trial court's decision granting or denying a motion for new trial under 59(a)(5) is whether the trial court has abused its discretion. We recently reaffirmed that in *Black v. Reynolds*, 109 Idaho 277, 707 P.2d 388 (1985). Both the majority's initial opinion and opinion on denial of petition for rehearing are completely devoid of any explanation, or, indeed, assertion that the trial court abused its discretion in the present case in granting defendant's 59(a)(5) motion for new trial. In its initial opinion, the majority remanded to the trial court "so that it may enter findings of fact as to whether he was, in fact, shocked by the jury award or found such award unconscionable so as to have the appearance that it was given under the influence of passion or prejudice." (*Ante* at 616, 733 P.2d at 1241). If the majority has not established a "shock the conscience" or "unconscionable" test, as it now asserts in its opinion on denial of petition for rehearing, why has it not withdrawn the language in the original opinion remanding for findings on "whether he was, in fact, shocked by the jury award or found such award unconscionable"? If the majority has not adopted a new "shock the conscience" standard, as it now disclaims in the opinion on denial of rehearing, what

remains for the trial court to do in this case upon remand? Absent any other indication of how it abused its discretion, the trial court will surely wonder on remand what is left for it to do in order to comply with the standards of *Dinneen*. The only logical answer to such a question is, nothing. The trial court in its considered decision has already conscientiously applied the *Dinneen* standard. Nothing in the majority's initial opinion or opinion on denial of petition for rehearing demonstrates otherwise. Apart from the "shock the conscience" and "unconscionable" language found in the majority's initial opinion, which it now denies is part of a new standard, the only other claim for the majority's assertion that the trial court erred in the present case (without specifically finding that it abused its discretion) was that the trial court granted the new trial-remitittur even though the trial court acknowledged that the jury's award was supported by substantial competent evidence. However, as we said in *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187, 1196 (1986), *quoting* from *Dinneen v. Finch, supra:*

> " 'The rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial.' "

To the extent that the majority's original opinion, as grounds for reversing the trial court, relied upon the trial court's acknowledgement that there was substantial competent evidence to support the jury's verdict, the majority has relied upon a matter which both *Quick* and *Dinneen* held "has no application to a ... ruling upon a motion for a new trial." Any issue of whether the jury's verdict is supported by substantial competent evidence is germane only to motions for j.n.o.v., as clearly set forth in Justice Donaldson's opinion in *Quick v. Crane, supra.* The issue of supporting evidence has no bearing and is entirely irrelevant to the determination of whether a new trial or remittitur should be granted under 59(a)(5). *Quick v. Crane, supra; Dinneen v. Finch, supra.*

Finally, the majority's assertion that the trial court must first find fault with the jury itself before granting a motion for new trial under 59(a)(5) is a proposition entirely unsupported by any authority. Indeed, allegations of jury fault or misconduct are properly addressed under motions for new trial pursuant to Rule 59(a)(1) and (a)(2). Like the issue of substantial evidence to support the jury verdict, any issues regarding fault of the jury itself are entirely irrelevant to the motion for new trial premised on 59(a)(5). *Quick v. Crane, supra.*

The only other intimation remaining in the majority's initial opinion in this case regarding trial court error is the majority's pronouncement that neither *Dinneen* nor *Quick* countenance a trial judge substituting his opinion for that of the jury. However, that is precisely what *Quick v. Crane, supra*, and *Dinneen v. Finch, supra*, expressly require the trial court to do:

> " 'The trial court must weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not to stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive 'as a matter of law.' " *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187, 1196 (1986), *quoting from Dinneen v. Finch, supra.*

*Quick* and *Dinneen* expressly provide that the trial judge's assessment of damages takes precedent over that of the jury *if* the two awards are so disparate as to suggest to the trial court the influence of passion or prejudice. "It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient." *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187, 1196 (1986). The majority's argument regarding substitution of the court's

opinion for that of the jury is entirely erroneous and circuitous. The *Dinneen* process was originally designed to ensure that due deference would be given to the jury's decision by the trial court. Once the trial judge goes through the *Dinneen* process and determines that a sufficient disparity exists such as to suggest the influence of passion or prejudice, he may properly substitute his opinion for that of the jury by either awarding a new trial outright or conditioning his award of new trial upon acceptance of a remitittur or additur.

There can be no suggestion in the present case that the trial judge did not give adequate consideration to the jury's determination. Indeed, he was very reluctant to have to disagree with the jury, but nevertheless stated that he could not "in good conscience" come within $400,000 of the jury's verdict. Based upon that disparity, the trial court expressly found, in open court, that the disparity was sufficient to meet the *Dinneen* standard of "appearance of passion or prejudice." In explaining that conclusion the trial court said, "I don't see any way around it under the *Dinneen* decision." He observed that "the *Dinneen* case gave no guidance as to what significant disparity means to the point of suggesting passion or prejudice," but he nevertheless concluded that "over 29% would probably be—I thought would *certainly be considered sufficient.*" (Emphasis supplied). The majority's initial opinion and the opinion on denial of petition for rehearing entirely ignore this explicit finding by the trial court of the appearance of passion or prejudice in the jury's verdict in the present case. If the Court's two opinions in this case have indeed not established "any new standard or test," *ante* at 631, 733 P.2d at 1256, then unquestionably the trial court's decision should be affirmed.

## II

The opinion on denial of petition for rehearing also seriously errs in its holding that the issue of Sanchez's alienage status "would undoubtedly be moot in the event of a new trial since the passage into law on November 5, 1986, of the Immigration Reform and Control Act of 1986, Public Law 99–603." *Ante* at 631, 733 P.2d at 1256. At a minimum, any question of mootness regarding the alienage issue involves questions of fact upon which the defendant was entitled to a jury trial. The majority's assertion that the alienage status issue has been rendered moot is at best mere speculation. The 1986 Immigration Reform & Control Act merely "provide[s] a controlled legalization program *for certain* undocumented aliens who have entered this country prior to 1982." There is nothing in this record to show that Sanchez would qualify and, even if he did, there is no guarantee in that legislation that any alien who meets the qualifications will necessarily be permitted to remain in this country.

The legalization program referred to in the 1986 act only provides for *temporary* resident status and then only *if* the illegal alien meets certain qualifications. The record in the present case is obviously devoid of *any* information as to whether Sanchez meets any of the requirements of the act because the trial court's action granting the motion *in limine* regarding the alienage issue prevented the defendants from developing an adequate record regarding the issue. The requirements which Sanchez must demonstrate that he meets in order to obtain temporary resident status under the act include the following:

(1) that he has resided *continuously* in the United States from the date of illegal entry and from the date of application; 1986 Act, § 245A(a)(2)(A);

(2) that he is otherwise admissible immigrant (which calls into play most all of the immigration laws, including the numerical limitations on immigrants [1]); *Id.,* § 245A(a)(4)(A);

---

1. The 1986 act expressly provides that the numerical limitations contained in 8 U.S.C. §§ 1151, 1152, do not apply to adjustment of status to *permanent* resident status, 1986 Act,

§ 245A(d)(1). However, nowhere does the act contain such an express exclusion regarding adjustment to *temporary* resident status. *State v. Michael,* 111 Idaho 930, 729 P.2d 405 (1986)

(3) that he has not been convicted of any felony or three misdemeanors; *Id.* § 245A(a)(4)(B); and

(4) that he is registered under the Military Selective Service Act, if so required under that act.

As number (1) above indicates, the first requirement that must be met is, obviously, the timely filing of an application for adjustment of status. This requirement alone is sufficient to defeat any assertion of mootness. Nothing before this Court indicates that such an application has been filed by Sanchez or even that such an application will be filed. The record is entirely lacking in any assertion by Sanchez that he desires or intends to become a United States citizen or even a permanent resident in this country. Without any evidence in the record regarding Sanchez's conduct while in the United States, it is impossible to determine whether or not he would qualify under the 1986 act. Any determination of mootness would require this Court to engage in the very type of speculation which the majority so strongly urges the Court to eschew under its analysis of the issue. *Ante* at 631, 733 P.2d at 1256.

SHEPARD, C.J., concurs.

("the specific mention of one thing implies the exclusion of another; expressio unius est exclusio alterius").